30 A.3d 870

**William E. BRISCOE**

v.

**STATE of Maryland.**

**No. 4, Sept. Term, 2010.**

Court of Appeals of Maryland.

Oct. 24, 2011.

Brian M. Saccenti, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY*, ADKINS and BARBERA, JJ.

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

BARBERA, J.

Petitioner William E. Briscoe was tried before a jury in the Circuit Court for Baltimore City and convicted of the crimes of possessing a regulated firearm after having been convicted of a disqualifying crime; wearing, carrying, or transporting a handgun in a vehicle; possessing cocaine; and driving on a suspended license. Those convictions were based on evidence the police recovered while searching Petitioner's vehicle at the time of his arrest. At that time, the police found cocaine in the center console of the passenger compartment and a handgun in the locked glove compartment.

Petitioner did not challenge the seizure of the cocaine, but he did seek suppression of the handgun, claiming that it was the fruit of a search forbidden by the Fourth Amendment. The suppression court denied the motion, finding that the evidence was lawfully obtained either as a valid inventory search under *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and its progeny, or as a valid search incident to arrest under *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

On appeal to the Court of Special Appeals, Petitioner challenged the Circuit Court's denial of his motion to suppress the handgun. While the case was pending in that court, the Supreme Court decided *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). The State conceded that, under *Gant*, the search violated the Fourth Amendment. The State argued, though, that Petitioner was not entitled to suppression of the handgun, by application of the good-faith exception to the Fourth Amendment's exclusionary rule. In the State's view, the police conducted the search "rely[ing] in good faith on controlling judicial precedent." The Court of Special Appeals did not reach the *Gant* issue, holding instead that the handgun found within the locked glove compartment was recovered during a valid inventory search. Petitioner filed a petition for writ of certiorari, which we granted to answer the following questions:

1. Did the circuit court err in finding that a search of a vehicle was a valid inventory search where the State failed to establish (a) that there was a legitimate need to tow the vehicle, (b) that the officer made an inventory list and gave a copy to the driver, (c) that the towing of the vehicle and the opening of the locked glove compartment were permitted by established standardized policies, or (d) that the opening of the locked glove box was necessary to safeguard property against loss?

2. In light of the Supreme Court's recent decision in *Arizona v. Gant,* [556 U.S. 332, 129 S.Ct. 1710] (2009), did the circuit court err in finding that a search of a vehicle, which included a search of the locked glove compartment, was a valid search incident to arrest where the State failed to establish that the arrestee was unsecured and within reaching distance of the vehicle at the time of the search, and where the police had the keys to the locked glove compartment?

At the time of briefing and oral argument in this case, the parties and the Court were aware that the issue generated by the State's good-faith argument was in material respect identical to an issue then pending *certiorari* review in the Supreme Court. The Court granted the writ in *Davis v. United States,* —— U.S. ——, 131 S.Ct. 502, 178 L.Ed.2d 368 (2010), and on June 16, 2011, issued its opinion in the case. 564 U.S. ——, 131 S.Ct. 2419, 180 L.Ed.2d 285.[1]

The *Davis* Court held, much as the State has argued in the present case, "that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 564 U.S. at ——, 131 S.Ct. at 2423–24.

---

1. Both counsel in the case at bar correctly anticipated the arguments that were advanced by the parties in *Davis,* and both were well prepared to respond to this Court's questions concerning how the Supreme Court's potential decision on the issue might apply to Petitioner. In particular, counsel addressed whether binding appellate precedent in Maryland at the time of the search at issue here would permit the search of the locked glove compartment of Petitioner's vehicle. We therefore find it unnecessary to order (and the parties have not requested) post-*Davis* reargument of the issue.

The holding of *Davis* applies to the second question before us. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past"); *State v. Daughtry*, 419 Md. 35, 78, 18 A.3d 60, 86 (2011) (stating same). Applying *Davis* to that question, we must determine whether, incident to Petitioner's arrest, the police searched the locked glove compartment in objectively reasonable reliance on then-binding Maryland appellate precedent, namely *Belton.*

For reasons we shall explain more fully, we hold that the search of the glove compartment was not a valid inventory search. We further hold that, under *Davis,* the good-faith exception to the exclusionary rule applies to what, at the time, was a lawful search of the glove compartment, under *Belton.* We therefore affirm the judgment of the Court of Special Appeals, albeit on a ground not relied upon by that court.

## I.

### A. *The Suppression Motion Hearing*

Baltimore City Police Officer Lavgh Bormanshinov was the sole witness at the hearing on Petitioner's motion to suppress the handgun. Officer Bormanshinov testified as follows about the sequence of events before and during the search of Petitioner's vehicle:

On June 26, 2007, at 12:50 a.m., Officer Bormanshinov observed a minivan traveling near the 1200 block of Presstman Street in Baltimore. Its taillights were not illuminated. Officer Bormanshinov activated his lights and trained his spotlight on the minivan, indicating to the driver that he pull over. The driver, Petitioner, immediately stopped the minivan.

Officer Bormanshinov approached the vehicle and asked Petitioner for his driver's license and the vehicle's registration.

Petitioner could not produce his driver's license, but he did provide the officer with the registration. The registration showed that the minivan was owned by Ms. Luella Lane.

Officer Bormanshinov returned to his vehicle and, using the information Petitioner supplied him, discovered that Petitioner's license was suspended and there was an open arrest warrant for him. Officer Bormanshinov returned to the minivan and asked Petitioner for the keys, which Petitioner gave him. Officer Bormanshinov then went back to his vehicle and, upon further investigation, learned that the warrant was "positive." [2] Officer Bormanshinov removed Petitioner and his passenger, Jeremy Ringgold, from the minivan. Officer Bormanshinov arrested Petitioner, searched him, and sat him on the curb.

At some point during the preceding events, Officer Bormanshinov's Sergeant, whose name is not reflected in the record, arrived on the scene. The Sergeant stood next to the passenger door to monitor the then-still-seated front seat passenger, Ringgold, while Officer Bormanshinov further investigated the warrant for Petitioner. When Officer Bormanshinov returned, he asked Ringgold for identification for the purpose of running a "warrant check." Ringgold was unable to comply. Consequently, Officer Bormanshinov and his Sergeant removed Ringgold from the minivan, as well. Officer Bormanshinov searched Ringgold (evidently finding nothing of relevance to the present case) and sat him on the curb next to Petitioner.

Officer Bormanshinov testified that, "[s]ince [Petitioner] was arrested," he "did an inventory search of the vehicle." Using the keys Petitioner gave to him, Officer Bormanshinov unlocked the glove compartment and found a handgun inside. He also found several vials of suspected cocaine, one in the coin slot to the left of the steering wheel and two more in a Colt 45 can that was in the vehicle's center console.

---

**2.** The record does not disclose what Officer Bormanshinov meant by the term "positive."

The State did not ask further questions of Officer Bormanshinov concerning the purported "inventory search." Neither did the State introduce any evidence of a Baltimore City Police Department policy or procedure regarding inventory searches.

At some point, Officer Bormanshinov decided to have the minivan towed to the "City yard." Officer Bormanshinov tried without success to have Ms. Lane, the owner of the vehicle, contacted to let her know that her car would be towed to the impound lot.

During cross-examination, Officer Bormanshinov testified that Petitioner was calm, polite, cooperative, and sober during the traffic stop, arrest, and search of the minivan. Defense counsel then asked Officer Bormanshinov when the decision was made to tow the minivan, and he responded simply, "My plan was to tow the vehicle. But I had to do a search of the vehicle before—that's our procedure—before it gets towed." Defense counsel propounded further questions on this point, resulting in the following exchange:

Defense Counsel: Are you familiar with the general order that requires you to follow all of the procedures for towing a car or impounding a car?

Officer Bormanshinov: I believe once the driver's suspended and he or she is not the registered owner, then the car, car can be towed.

Defense Counsel: But do you have any policies or procedures that direct you what you're supposed to do in that situation?

Officer Bormanshinov: I have not come across that.

Defense Counsel: You're not familiar with any general orders describing what you should be doing in that situation?

Officer Bormanshinov: No, ma'am.

\*　　\*　　\*

Defense Counsel: You're not familiar with the towing procedures that require you to do a complete and total inventory of everything that's in the car?

Officer Bormanshinov: I'm familiar with that, ma'am.

Defense Counsel: You are?

Officer Bormanshinov: With the inventory, yes.

Defense Counsel: So then you completed your vehicle report; isn't that correct?

Officer Bormanshinov: Yes.

Defense Counsel: And your vehicle report notes everything that was inventoried in the car?

Officer Bormanshinov: I believe there was nothing of value to be inventoried in the vehicle.

Defense Counsel: But don't your own general orders require you to write down everything that belongs to the owner in order to protect them and protect the property?

Officer Bormanshinov: I, I'm not sure of that, ma'am.

Defense Counsel: Can you tell us what was in the car?

Officer Bormanshinov: Yes, an empty oxygen tank.

At the conclusion of Officer Bormanshinov's testimony, defense counsel sought suppression of the handgun on the ground that the search of the locked glove compartment was not a valid inventory search. Defense counsel argued that "the officer was [un]able to articulate what the procedure was. He was unable to produce any of the orders. He was unable to repeat any training that he's had in this case." For those reasons, defense counsel maintained that the search was not a "legitimate" inventory search, but instead was "an excuse [for] further investigation."

The State disagreed. In the State's view, Officer Bormanshinov conducted a valid inventory search of the vehicle, including the glove compartment. The State further argued that, even if the search was not valid as an inventory search, the search of the glove compartment was authorized as a part of a search incident to arrest under the then-prevailing Su-

preme Court authority of *Belton,* 453 U.S. at 460, n. 4, 101 S.Ct. 2860.

The motions court denied the motion to suppress. The court explained:

> I think it was a valid inventory search and I think, although the officer didn't have the administrative order at hand to cite, he was certainly familiar with it and it was a routine that he was familiar with and followed the steps.... Also, in light of [*Hamel v. State,* 179 Md.App. 1, 943 A.2d 686 (2008),] [3] ... given to me by the State which bears a recent date, which indicates that the Court of Appeals hasn't had its say on that yet.... But certainly, this search would fall within the ambit of what was found to be under the Constitution in a search incident to arrest. I mean, they just clearly held that a locked glove compartment is within the ambit under the latest Supreme Court decision. So, under either theory, it was a valid search.

### B. *The Trial and Appeal*

Petitioner was subsequently convicted by a jury on all counts and sentenced to imprisonment for five years, without the possibility of parole. On appeal to the Court of Special Appeals, Petitioner argued that the trial court erred in denying the motion to suppress because the search was neither a valid inventory search nor a valid search incident to arrest, under *Belton.* In an unreported opinion, the Court of Special Appeals affirmed the judgments of conviction, holding "that the inventory search of the minivan in this case was reasonable." The court therefore did not address whether the search of the glove compartment was a valid search incident to Petitioner's arrest.

### II.

Searches done without a warrant are "presumed to be unreasonable." *Henderson v. State,* 416 Md. 125, 148, 5

---

3. In *Hamel,* the Court of Special Appeals held that a locked glove compartment falls within the scope of a lawful search under *Belton.* 179 Md.App. 1, 18, 943 A.2d 686, 696 (2008).

A.3d 1072, 1085 (2010) (stating that a search unaccompanied by a warrant "is presumptively unreasonable"). There are, however, recognized exceptions to the warrant requirement, two of which are relevant to the present case. The first is known as the "inventory search," which generally authorizes the search of a vehicle in lawful police custody for the purpose of cataloging property located therein. *See Opperman*, 428 U.S. at 376, 96 S.Ct. 3092; *Duncan v. State*, 281 Md. 247, 259, 378 A.2d 1108, 1116 (1977). The second is the "search incident to a lawful arrest." *United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 768, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (holding that a search incident to arrest permits the law enforcement officer to search the person of the arrestee and the area around the arrestee where the arrestee might reach to grab a weapon or evidence); *Belton*, 453 U.S. at 460, 101 S.Ct. 2860 (applying *Chimel's* holding to the search of a vehicle incident to the arrest of a recent occupant). As with any warrantless search, the State bears the burden to overcome the presumption of unreasonableness. *Paulino v. State*, 399 Md. 341, 348, 924 A.2d 308, 313 (2007).

In reviewing the ruling of the suppression court, we must rely solely upon the record developed at the suppression hearing. *See, e.g., Lee v. State*, 418 Md. 136, 148, 12 A.3d 1238, 1245 (2011). We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion, *id.*, 12 A.3d at 1245, here, the State. We give deference to the first-level factual findings made by the suppression court, and we accept those findings unless shown to be clearly erroneous. *See, e.g., Elliott v. State*, 417 Md. 413, 427, 10 A.3d 761, 769 (2010). We, however, make an independent appraisal of the constitutionality of a search, "applying the law to the facts found in each particular case." *Id.* at 428, 10 A.3d at 769 (quoting *Belote v. State*, 411 Md. 104, 120, 981 A.2d 1247, 1256 (2009)) (internal quotation mark omitted).

A.  *Inventory Search*

1.

We first address the State's contention that the search of the locked glove compartment was undertaken in the course of a lawful inventory search, under *Opperman, Duncan,* and related jurisprudence.  Pursuant to this well-defined exception to the warrant requirement, a search of a vehicle for the purpose of itemizing the property therein is constitutional, so long as the vehicle is in lawful police custody at the time of the search and the search is carried out pursuant to "standardized criteria or [an] established routine" established by the law enforcement agency. *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (citation omitted).

The purposes of an inventory search are three:  to protect the police from danger, to protect the owner's property, and to protect the police against claims and disputes over lost or stolen property.  *Duncan v. State,* 281 Md. 247, 257, 378 A.2d 1108, 1115 (1977) (citing *Opperman,* 428 U.S. at 369, 96 S.Ct. 3092).  As with all exceptions to the warrant requirement, use of the inventory search must be limited to those circumstances that are tied to the precise justifications for it, which do not include criminal investigation.  *See Wells,* 495 U.S. at 4, 110 S.Ct. 1632 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").  Therefore, the State must ensure that the record of the suppression hearing reflects both that the vehicle was in lawful police custody at the time of the search *and* that the search was conducted in accordance with a sufficiently standardized departmental policy or routine.  *See Wells,* 495 U.S. at 4–5, 110 S.Ct. 1632; *Duncan,* 281 Md. at 259, 378 A.2d at 1116.

Petitioner advances several arguments in support of the contention that the State failed to establish that the search of the vehicle falls within the limited purview of an "inventory search."  He argues:  (1) the State failed to establish at the suppression hearing that, at the time of the search, the vehicle was in lawful police custody;  (2) Officer Bormanshinov's list-

ing of only the contraband (cocaine and handgun) on the purported inventory list undermines the State's assertion that Officer Bormanshinov was conducting a valid inventory search; and (3) the record contains no evidence of a departmental policy that permitted, authorized, or otherwise regulated the search of closed or locked containers, rendering the motion court's ruling fatally flawed under *Wells*.

Officer Bormanshinov testified that, once he determined that the vehicle was not owned by Petitioner, he attempted to contact the owner, Ms. Luella Lane, to advise her that her car would be towed to the impound lot. When asked by defense counsel why it was necessary to tow the vehicle, Officer Bormanshinov replied that he "believ[ed that] once the driver's suspended and he or she is not the registered owner, then the car ... can be towed." However, he had "not come across," and was not familiar with, any procedures or orders governing the appropriate action in that situation. Moreover, Officer Bormanshinov could only testify that "I had to do a search of the vehicle before—that's our procedure—before it gets towed."

We shall assume, without deciding, that Officer Bormanshinov's references to a "procedure" (without any mention of a specific rule or regulation) sufficed to establish the existence of a sufficiently routinized, general departmental inventory search policy. Even so, Officer Bormanshinov's testimony gives no indication that the supposed policy provides standardized criteria governing the search of closed or locked containers and, if so, that the search of the locked glove compartment was done according to that policy.

The State correctly notes that, in the context of inventory searches, "nothing ... prohibits the exercise of police discretion *so long as* that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Colorado v. Bertine*, 479 U.S. 367, 375, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (emphasis added). Such discretion, however, must be exercised pursuant to standardized criteria, which, with re-

spect to the search of closed and/or locked containers, are not present in the record before us.

The Supreme Court addressed this precise point in *Wells*. The defendant in that case was stopped for speeding and subsequently arrested for driving under the influence of alcohol. 495 U.S. at 2, 110 S.Ct. 1632. In an inventory search that followed, a locked suitcase was found within the locked trunk.[4] *Id.* The suitcase was forced open, revealing a garbage bag containing marijuana. *Id.* The defendant asserted that the search of the locked suitcase exceeded the scope of a valid inventory search. *Id.* at 2–3, 110 S.Ct. 1632.

The Court agreed with Wells that the search of the locked suitcase could not be upheld as an inventory search, because "the record contained no evidence of any Highway Patrol policy on the opening of closed containers found during inventory searches." *Id.* at 3, 110 S.Ct. 1632. Nor did the Court assume that there was one, in the absence of any indication in the record of a departmental policy on the subject; rather, the Court analyzed the case as if there were no such policy, stating that the department "had no policy whatever with respect to the opening of closed containers encountered during an inventory search." *Id.* at 4–5, 110 S.Ct. 1632. Consequently, the Court held that the search "was not sufficiently regulated to satisfy the Fourth Amendment" and therefore the evidence found incident to the search was correctly suppressed. *Id.* at 5, 110 S.Ct. 1632.

The case at bar suffers from the same lack of evidence in the record of a Baltimore City Police Department policy concerning the opening of locked containers during an inventory search. In the absence of evidence that such a policy existed, it is impossible to distinguish a valid inventory search from a general investigatory search. As in *Wells*, we are

---

4. The opinion of the Supreme Court of Florida discloses that the car Wells was driving at the time of the stop had been loaned to him, and that he gave the police permission to open the locked trunk, but not permission to open anything that might be found therein. *State v. Wells*, 539 So.2d 464, 466 (1989).

constrained to conclude in the present case that the search of the locked glove compartment was not "sufficiently regulated to satisfy the Fourth Amendment," *Wells,* 495 U.S. at 5, 110 S.Ct. 1632, to qualify as an inventory search.[5]

2.

The State, perhaps predicting that we would reach this conclusion, argues that, even if "Officer Bormanshinov's on-scene search was not a proper inventory, the evidence was nevertheless admissible under the inevitable discovery doctrine." We disagree.

"The exception [to the warrant requirement] for exigent circumstances is a narrow one." *Williams v. State,* 372 Md. 386, 402, 813 A.2d 231, 241 (2002). Under the inevitable discovery doctrine, "[e]vidence obtained as a result of an illegal search is admissible where, absent the illegal conduct, the evidence inevitably would have been discovered through legal means." *Id.* at 415, 813 A.2d at 248. According to the State, that doctrine is applicable here, because "[t]here can be no question that the police had authority to, and ultimately did, tow and impound [Petitioner's] minivan. Thus, the search of the vehicle undoubtedly would have occurred regardless of Officer Bormanshinov's on-scene investigatory search."

The problem with the State's argument is that the record before us is devoid of evidence demonstrating that the vehicle's locked glove compartment would have been inventoried according to departmental policy, once it was towed to the impound lot. Without such evidence in the record, we are unable to conclude that the handgun would have been discovered inevitably, in a later inventory search of the locked glove compartment. *See United States v. Mendez,* 315 F.3d 132,

---

5. Unlike in the case before us, the record in *Wells* contained the Florida Highway Patrol's written inventory policy. *See Wells,* 539 So.2d at 469. And yet, because that policy in *Wells* made "no mention of opening closed containers," both the Florida Supreme Court and the United States Supreme Court held that the search was not a valid inventory search. *Id.*

137–38 (2d Cir.2002) (explaining that for the inevitable discovery doctrine to apply to inventory searches, the government must prove: "(1) that the police had legitimate custody of the vehicle ... so that an inventory search would have been justified; (2) that when the police in the police agency in question conducted the inventory searches, they did so pursuant to 'established' or 'standardized' procedures; and (3) that those inventory procedures would have 'inevitably' led to the 'discovery' of the challenged evidence" (citations omitted)).

In sum, the search of the locked glove compartment cannot be upheld either as a proper inventory search or as evidence that would have been "inevitably discovered" in a subsequent inventory search.

### B.

#### 1.  *Search Incident to Arrest*

At the time of the search at issue in this case, *Belton* was the rule that guided the search of a vehicle, as a search incident to the arrest of a recent occupant.  The Supreme Court held in *Belton* that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  453 U.S. at 460, 101 S.Ct. 2860 (footnote omitted).  The Court considered that rule to be an application, in the vehicle context, of its analysis in *Chimel.  Id. Chimel* "established that a search incident to arrest may not stray beyond the area within the immediate control of the arrestee...."  *Id.* The *Belton* Court reasoned "that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or eviden[ce].'" *Id.* (quoting *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034).  Under *Belton,* "the police may also examine the contents of any containers found within the passenger compartment." *Id.* "Containers," as defined in *Belton,* includes the glove compartment.  *Id.* at 460 n. 4, 101 S.Ct. 2860.

The Supreme Court subsequently acknowledged in *Gant* that *Belton* was "widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there [was] no possibility the arrestee could gain access to the vehicle at the time of the search." 556 U.S. at ——, 129 S.Ct. at 1718. Maryland courts were no different in this regard. *See, e.g., Gee v. State,* 291 Md. 663, 668, 435 A.2d 1387, 1390 (1981) (holding that the search of the defendant's closed wallet found on the car seat of the defendant's vehicle incident to his arrest was authorized under the "bright-line" rule of *Belton* and that *Belton* was dispositive because the search was of a passenger compartment contemporaneous to a lawful arrest); *McCain v. State,* 194 Md.App. 252, 284, 276, 4 A.3d 53, 66 (2010) (explaining that Maryland adopted the "broad reading of *Belton*"); *Purnell v. State,* 171 Md.App. 582, 602, 911 A.2d 867, 879 (2006) (applying the *Belton* rule to searches of property belonging to third-parties located within the passenger compartment of a vehicle incident to the arrest of a vehicle occupant).

Subsequent to the search of the vehicle incident to Petitioner's arrest, the Supreme Court decided *Gant.* In *Gant,* the Supreme Court rejected the prevailing interpretation of *Belton,* explaining: "We now know that articles inside the passenger compartment are rarely within the area into which an arrestee might reach, and blind adherence to *Belton's* faulty assumption would authorize myriad unconstitutional searches." 556 U.S. at ——, 129 S.Ct. at 1723 (citation and internal quotation marks omitted). The Court adopted the following rule in *Gant:* "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of the arrest." 556 U.S. at ——, 129 S.Ct. at 1723.

### 2. *Application of the Good–Faith Exception?*

The Supreme Court's decision in *Gant* has generated the second question Petitioner presents, which is whether Petitioner is entitled to the benefit of the rule established in

that case, thereby requiring suppression of the handgun that was seized during the search of the minivan. The State has conceded that the search of the minivan was unlawful, under *Gant.* We shall accept that concession and assume, *for discussion purposes only,* that the State was correct to concede that issue. The State argues that, although the search was not proper under *Gant,* Petitioner is not entitled to suppression of the handgun, by operation of the "good-faith" principles announced in *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). This is so, the State argues, because Officer Bormanshinov acted in objectively reasonable reliance on appellate precedent then-binding in Maryland, namely, *Belton.*[6] The State asserts the very argument that since has carried the day in *Davis.*

---

**6.** The phrase "objectively reasonable reliance" means in the context of the present case that Officer Bormanshinov, at the time of the search of the passenger area of the car, could conduct the search under the authority of *Belton,* so long as the so-called objectively reasonable officer (but not necessarily Officer Bormanshinov), knowing what Officer Bormanshinov knew at the time, could conduct a *Belton* search. It is well settled that,

> Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify [the challenged] action. If so, that action was reasonable *whatever* the subjective intent motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts; and it promotes evenhanded, uniform enforcement of the law.

*Ashcroft v. al-Kidd,* 563 U.S. ——, ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citations and internal quotation marks omitted). The principle of "objectively reasonable reliance" was applied in *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). In that case, the Court held that an arrest was lawful where the officers were possessed of facts that gave rise to probable cause to arrest the person (Alford), even though they relied, wrongly, on an altogether different legal basis in making the arrest. The Court explained:

> As we have repeatedly explained, the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. The Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, *whatever* that subjective intent.

*Id.* at 153, 125 S.Ct. 588 (citations and internal quotation marks omitted).

The search at issue in *Davis* had its genesis in a routine traffic stop that resulted in the arrests of the driver, for driving while intoxicated, and the passenger, Willie Davis, for giving a false name to police. 556 U.S. at ——, 131 S.Ct. at 2425. The police handcuffed the driver and Davis and placed them in the back of separate patrol cars. *Id.* at ——, 131 S.Ct. at 2425. The police then searched the passenger compartment of the vehicle and found a revolver inside Davis's jacket pocket, which had been left there. *Id.* at ——, 131 S.Ct. at 2425.

Davis sought suppression of the revolver. *Id.* at ——, 131 S.Ct. at 2426. Before the federal district judge, Davis acknowledged that the "search fully complied with existing Eleventh Circuit precedent," though he still sought to preserve the issue for appeal. *Id.* at ——, 131 S.Ct. at 2426 (internal quotation marks omitted). The district court denied that motion. *Id.* at ——, 131 S.Ct. at 2426. Davis was convicted and, while his appeal was pending before the Eleventh Circuit, the Supreme Court decided *Gant. Id.* at ——, 131 S.Ct. at 2426. Davis argued that, under *Gant,* the search of the vehicle was unconstitutional, and therefore he was entitled to suppression of the revolver found during that search. *United States v. Davis,* 598 F.3d 1259, 1263 (11th Cir.2010).

The Court of Appeals for the Eleventh Circuit agreed that the search was unconstitutional but refused to exclude the evidence, holding instead that the good-faith exception was applicable. *Id.* The court explained that, "like most other courts, [it] had read *Belton* to mean that police could search a vehicle incident to a recent occupant's arrest regardless of the occupant's actual control over the passenger compartment." *Id.* at 1263. The court emphasized that,

> [a]lthough an officer's mistake of law cannot provide objectively reasonable grounds for a search, the mistake of law here was not attributable to the police. On the contrary, the governing law in this circuit unambiguously allowed [the officer] to search the car. Relying on a court of appeals' well-settled and unequivocal precedent is analogous to rely-

ing on a statute, or a facially sufficient warrant—not to personally misinterpreting the law.

*Id.* at 1267–68 (internal citations omitted). The court held that, because the police officer "reasonably relied on clear and well-settled precedent[,]" the good-faith exception to the exclusionary rule applied. *Id.* at 1266.

The Supreme Court granted a writ of certiorari, 556 U.S. at ——, 131 S.Ct. at 2426, and affirmed, *id.* at ——, 131 S.Ct. at 2434. The *Davis* Court began by noting that the parties agreed that the search in question, when conducted, was authorized by binding Eleventh Circuit precedent, and the parties agreed that the search did not comport with the requirements of *Gant. Id.* at ——, 131 S.Ct. at 2428. The parties disagreed, however, about whether *Gant* was to be applied retroactively, *id.* at ——, 131 S.Ct. at 2430, and, if so, whether the good-faith exception would preclude application of the exclusionary rule, *id.* at ——, 131 S.Ct. at 2431.

The Supreme Court had no difficulty deciding that *Gant* was to be retroactively applied. *Id.* at ——, 131 S.Ct. at 2431. The Court then turned to the more difficult question: whether the exclusionary rule must also be applied. *Id.* at ——, 131 S.Ct. at 2431. The Court framed the questions as "whether to apply this sanction when the police conduct a search in compliance with binding precedent that is later overruled." *Id.* at ——, 131 S.Ct. at 2423. The Court held: "Because suppression would do nothing to deter police misconduct in these circumstances, and because it would come at a high cost to both the truth and the public safety, we hold that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* at ——, 131 S.Ct. at 2423–24.

The *Davis* Court noted that "[e]xclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* at ——, 131 S.Ct. at 2426 (quoting *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). Instead, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations."

*Davis,* 564 U.S. ——, 131 S.Ct. at 2426. It was for that reason, the Court explained, that the good-faith exception to the exclusionary rule was developed in *Leon,* 468 U.S. at 922, 104 S.Ct. 3405 (declining to apply the exclusionary rule where police officers conducted a search in "objectively reasonable reliance" on a warrant later determined invalid), and subsequently applied in *Illinois v. Krull,* 480 U.S. 340, 349–50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (applying the good-faith exception to a police officer's search that was conducted in accordance with a statute later deemed unconstitutional), *Arizona v. Evans,* 514 U.S. 1, 14, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (applying the good-faith exception to searches incident to arrests based on arrest warrant information contained within a database maintained by judicial employees later determined to be erroneous), and *Herring v. United States,* 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (applying the good-faith exception to searches conducted following execution of outstanding arrests warrants later determined to be erroneous due to police record-keeping error). *Id.* at ——, 131 S.Ct. at 2427–28. The *Davis* Court noted that the common theme throughout those cases was a lack of police officer culpability. *Id.* at ——, 131 S.Ct. at 2427–28.

The *Davis* Court concluded that application of the exclusionary rule was unwarranted in the case before the Court, given the same absence of police culpability; that is, the police, when conducting the search under *Belton,* did not "deliberately, recklessly, or with gross negligence[ ]" violate Davis's Fourth Amendment rights. *Id.* at ——, 131 S.Ct. at 2428. The Court pointed out that *Davis* had arisen out of the Eleventh Circuit, which had interpreted *Belton* "to establish a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest." 131 S.Ct. at 2428.

The principle that emerges from *Davis* is that operation of the exclusionary rule is suspended only when the evidence seized was the result of a search that, when conducted, was a "police practice" specifically authorized by the jurisdiction's precedent in which the officer operates. To decide whether

the particular search at issue in the present case—the search of the locked glove compartment—comes within the *Davis* rule, we must examine what Maryland law dictated at the time of that search.

The search of Petitioner's vehicle was conducted on June 26, 2007. At that time, the search of the minivan incident to Petitioner's arrest was governed by the then-prevailing *Belton* bright-line rule. *See Gee,* 291 Md. at 668, 435 A.2d at 1389–90; *McCain,* 194 Md.App. at 276, 4 A.3d at 66. Under *Belton,* a glove compartment is included in the *Belton* perimeter. *See Belton,* 453 U.S. at 461 n. 4, 101 S.Ct. 2860. At the time of the search at issue, no reported decision of this Court or the Court of Special Appeals had addressed specifically whether a police officer conducting a *Belton* search could open a *locked* glove compartment.

Petitioner takes the position that, because, at the time of the search at issue, no reported decision in Maryland expressly authorized police to open a locked glove compartment as part of a *Belton* search, there did not exist at that time "binding appellate" Maryland authority upon which Officer Bormanshinov could have "reasonably relied" in searching the glove compartment. The State acknowledges that there was no then-existing reported Maryland decision specifically authorizing the search of a locked glove compartment. The State points out, though, that, "just prior to the suppression hearing in this case, the Court of Special Appeals [in *Hamel,* 179 Md.App. at 18, 943 A.2d at 696] made it clear that *Belton* permitted the search of a locked gloved compartment." [7] Petitioner replies that *Hamel* is of no benefit to the State, because it was filed two months after the search in question and thus could not serve as precedent upon which Officer Bormanshinov could objectively and in good faith rely. We are in general accord with the State that the *Davis* good-faith excep-

---

**7.** We have mentioned that the suppression court relied on *Hamel* in ruling that the search of the glove compartment was a lawful search under *Belton.*

tion applies to the search at issue, although we take a slightly different tack in reaching that conclusion.

We understand the *Davis* Court's reference to binding appellate precedent to mean that the caselaw of the jurisdiction must have been clear about whether that jurisdiction had adopted the bright-line rule of *Belton.* Petitioner and the State do not disagree that, until *Gant* was decided, *Belton* was a part of Maryland law. And, under *Belton,* the police are entitled to search the entire passenger compartment of a vehicle, including the glove compartment. To repeat, the *Belton* Court made clear that, in a search for both weapons and destructible evidence incident to a valid arrest of a vehicle's occupant, police may search "inside the relatively narrow compass of the passenger compartment" of the vehicle, and may "examine the contents of any containers found within the passenger compartment[.]" 453 U.S. at 460, 101 S.Ct. 2860. The *Belton* Court defined "container" for this purpose as "denot[ing] any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like." *Id.* at 460–61 n. 4, 101 S.Ct. 2860. We believe it to be clear, under *Belton* itself, that a locked glove compartment is within the scope of the rule announced in that case, notwithstanding that the Court made no effort to include that detail or, for that matter, any other fact-specific details concerning the scope of the search. Indeed, the *Belton* Court expressly eschewed a fact-specific rule in favor of a bright-line rule that could be easily applied by officers in the field. *See id.* at 458, 101 S.Ct. 2860 ("[A] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." (internal quotation marks omitted)).

Petitioner is correct that, before the Court of Special Appeals's decision in *Hamel,* no reported Maryland appellate decision expressly held that the police, in conducting a *Belton* search, may open a locked glove compartment. Given the

bright-line nature of the *Belton* rule, however, it would be unfaithful to its very design and purpose to have its application and, in turn the application of the *Davis* good-faith exception, depend on whether a container, undeniably within the so-called *Belton* perimeter, is locked or unlocked. In other words, the Court of Special Appeals, in deciding *Hamel* as it did, merely applied the *Belton* rule to the specific facts of the case. *Hamel* did not create new "binding appellate precedent" in Maryland; rather, that case merely applied what was at the time, and had been since 1981, Maryland law.[8]

We therefore hold that, before *Gant*, binding appellate precedent in Maryland, namely *Belton*, dictated that searches incident to arrest of recent occupants of vehicles included searches of all containers, whether locked or unlocked, within the passenger areas of the vehicles. Officer Bormanshinov acted in objectively reasonable reliance on that authority when

---

**8.** Well before *Hamel*, the Court of Special Appeals encountered a case in which police officers had searched the locked console of an automobile as part of a *Belton* search and seized certain items inside. *State v. Fernon*, 133 Md.App. 41, 45, 754 A.2d 463, 465 (2000). Evidently it had not occurred to the respondent to argue that the search exceeded the scope of *Belton* because the items had been seized from the locked console. *Id.*, 754 A.2d at 465. The Court of Special Appeals upheld the search without commenting on the fact that the console had been locked. *Id.* at 64, 754 A.2d at 475–76. Other courts seemingly have been untroubled by *Belton* searches of locked containers. *See, e.g., United States v. Palmer*, 360 F.3d 1243, 1246–47 (10th Cir.2004) (holding that delay in unlocking and searching glove box to allow defendant to be removed to patrol car did not extinguish justification for protective search of locked glove box); *United States v. Valiant*, 873 F.2d 205, 206 (8th Cir.1989) (upholding search under *Belton* of locked briefcase within vehicle after placing defendant under arrest); *State v. Hanna*, 173 Ariz. 30, 839 P.2d 450, 452 (1992) (upholding search under *Belton* of locked glove compartment and listing cases upholding "warrantless searches incident to arrest where the possibility of an arrestee's grabbing a weapon or evidence were equally as remote"); *State v. Farr*, 24 Conn.App. 259, 587 A.2d 1047, 1050 (1991) (upholding search of locked glove compartment where defendant was removed from vehicle and placed in patrol car because area was within searchable zone under *Belton* ); *Lewis v. United States*, 632 A.2d 383, 388 n. 11 (D.C.1993) (noting that, although *Belton* did not apply because defendant had locked the vehicle and walked away before arrest and search, "[i]f the car could validly be searched under *Belton*, then the search could lawfully include the glove compartment, locked or unlocked").

he searched the locked glove compartment. It follows then, that the good-faith rule of *Davis* applies, and the suppression court correctly denied the motion to suppress the handgun found there.

We therefore affirm the judgment of the Court of Special Appeals, which had affirmed the judgments of conviction.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

BELL, C.J., joins in judgment only.