REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 1265
September Term, 2013

JAMAR SCRIBNER

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Kehoe,
Rodowsky, Lawrence F.
        (Retired, Specially Assigned),

JJ.

Opinion by Eyler, Deborah S., J.

Filed: September 2, 2014

Jamar Scribner, the appellant, was convicted by a jury in the Circuit Court for Anne Arundel County of possession with intent to distribute cocaine, possession of cocaine, and possession of a regulated firearm after being convicted of a disqualifying offense.[1] He was sentenced to eight years' imprisonment for possession with intent to distribute, and to a concurrent five years for the gun conviction. The remaining possession conviction merged for sentencing purposes.

The appellant asks two questions on appeal, which we have rephrased slightly:

I.  Did the circuit court err in denying the appellant's motion to suppress evidence?

II.  Did the trial court abuse its discretion by denying the appellant's motion for mistrial?

For the following reasons, we answer each question in the negative and shall affirm the judgments of the circuit court.

**I.**

**The Suppression Hearing**

**Facts and Proceedings**

Prior to trial, the appellant filed a motion to suppress evidence, namely, the firearm discovered and seized during the search of a car in which he had been a passenger. The court held a suppression hearing on May 16, 2013, and the following facts were adduced.

---

[1] The jury found the appellant not guilty of possessing a firearm under sufficient circumstances to constitute a nexus to a drug trafficking crime.

Detective Ryan Holby, of the Annapolis City Police Department, testified that on January 16, 2013, he was conducting remote video surveillance of a house at 103 Clay Street in Annapolis ("the house") in preparation for executing a search and seizure warrant there. A video camera was located near the house, and Detective Holby was monitoring the video feed from the police station. The warrant authorized a search of the house, which was associated with the appellant, for evidence related to "drugs, paraphernalia [and] distribution type stuff." During the course of the afternoon, Detective Holby observed the appellant exit the house, smoke a cigarette, and go back inside. He also observed the appellant walking across the street, "walking around" and "going in and out of the house."

Around 4:00 p.m., the appellant and a woman exited the house, got into a Toyota Solara, and drove away. The woman was driving and the appellant was in the front passenger seat. Detective Holby and his partner, Detective Newton,[2] drove from the police station "to attempt to locate the vehicle leaving the community." Five to ten minutes later, Detective Holby located the Solara on Forest Drive, in Annapolis, and proceeded to follow it into the parking lot of the Safeway grocery store on that road. The appellant and the woman exited the car and went into the Safeway.

Detective Holby watched the Solara while the appellant and the woman were in the store. No one else approached the vehicle or entered it.

---

[2]Detective Newton's first name is not in the record.

2

Detective Holby knew there was an open arrest warrant for the appellant for second-degree assault. He radioed for uniformed officers to come to the Safeway parking lot "so when [the appellant] came out of the store they could place him under arrest for the open warrant." About ten minutes after they entered the store, the appellant and the woman exited and "began to walk towards that vehicle." Detective Holby directed the uniformed officers "to go ahead [and] place [the appellant] under arrest for the open warrant."

Detective Holby observed the events as they transpired in the parking lot. When the uniformed officers approached, the woman went to the driver's door of the Solara and the appellant went "to the passenger side front door and attempt[ed] to get in." The officers stopped the appellant and handcuffed him. They searched his person, and found "a little bit of U.S. Currency and a clear plastic baggie of crack cocaine." The officers handcuffed the woman.

According to Detective Holby, at that point, "civilians started to gather around just to watch what everyone was doing, taking out cell phones, [possibly] calling people, taking pictures." He became concerned that someone in the crowd might know the appellant and might "tip off" someone at the house "to dispose of any evidence" before officers could execute the search warrant there. He also was concerned that the safety of the officers serving the warrant at the house could be compromised. For these reasons, Detective Holby advised Corporal Christopher Kintop, one of the arresting officers, to drive the Solara to a secure location "where [they] could search it further."

3

The appellant was placed in a police vehicle and driven to the police station, where he was booked. The woman also was taken to the police station, but was released sometime later.

Detectives Holby and Newton followed Corporal Kintop as he drove the Solara to the police station. Once they all arrived, Detectives Holby and Newton searched the Solara. Detective Holby found a green bag on the floor in front of the front passenger seat, where the appellant had been sitting when he and the woman were traveling to the Safeway. Inside the bag, he found a black revolver.

On cross-examination, Detective Holby stated that the search warrant for 103 Clay Street was for the house only and did not mention the Solara or any other vehicle. He acknowledged that the Solara did not belong to the appellant, but to Monica Watkins, who was not a target of the search warrant. He also acknowledged that he did not observe the appellant engaging in any behavior indicative of "drug transactions, CDS transactions" before the arrest. And he had no indication that the appellant was in possession of a gun. While he and Detective Newton were following the Solara, he did not "witness any furtive gestures or any furtive movements of any sort while [the appellant and the woman] were in the car." Nor did he witness the appellant or the woman "throw anything out the car window."

Officer Ralph DeFalco, also of the Annapolis City Police Department, testified that on January 16, 2013, Detective Holby called him and Corporal Kintop, his partner, to the

Safeway on Forest Drive to arrest the appellant on the open assault warrant. He and Corporal Kintop arrived in a marked police car. As the appellant and the woman accompanying him walked out of the Safeway, the officers "drove right up to the vehicle that [the appellant] was walking to." When the appellant was standing between the passenger side of the Solara and another car parked next to it, with his back to the officers, Officer DeFalco "grabbed him and said you're under arrest." The appellant "attempted to get into the front seat of the car" by "[p]ull[ing] away [and] reach[ing] for the handle," but Officer DeFalco stopped him. The car door remained closed during the arrest.

Officer DeFalco searched the appellant's person, and found a "clear plastic baggie containing a white rock like substance" in his front right pocket. Based on his training, knowledge, and experience Officer DeFalco believed the substance was crack cocaine. He also found a $20 bill in each of the appellant's front pockets.

Corporal Kintop testified that he drove the Solara from the Safeway parking lot to the parking lot of the police station. He did not search the Solara or tamper with any of the items in it while the vehicle was in his custody. He also did not observe anyone else enter the Solara or tamper with items inside it before he turned it over to the detectives who conducted the search.

At the end of the evidence phase of the suppression hearing, the prosecutor argued:

[T]his is a very clear search incident to arrest. Certainly, the officers went there with intention to arrest [the appellant] on the open arrest warrant. However, they then pat down the [appellant] and during the pat down – and remember the car it still on the scene, so the search of the car has not happened

5

at that point, during the pat down of the [appellant] they find CDS on his person.

* * *

So, I certainly think at the point that they find CDS on his person, the scope of the arrest has now broadened and they can now search the vehicle that he has been in, for any evidence of further criminal activity . . . .

The prosecutor pointed out that the appellant was charged with possession of crack cocaine with intent to distribute, and simple possession, that same day, January 16, 2013. She explained:

So, I think it's a difficult argument to make that at that point [the appellant is] only being arrested for the [assault charge]. [The appellant] certainly is being booked and charged at the same time with the new CDS charges, so I think that, certainly, they can search the vehicle for any evidence – further evidence of CDS.

The prosecutor further argued that, under *Arizona v. Gant*, 556 U.S. 332 (2009), the officers were justified in searching the Solara without a warrant for further evidence of the crimes for which the appellant was arrested; and "because [the appellant was] also being arrested for the CDS" the officers could search the vehicle he had recently occupied for further CDS-related evidence.

Defense counsel countered that *Gant* did not apply to the facts of this case, because the appellant was arrested for second-degree assault, not for possession of crack cocaine. Therefore, the arresting officers were not justified in searching the Solara for additional drug evidence.

6

At the conclusion of the suppression hearing, the court held the matter *sub curia*. It ruled from the bench four days later, on May 20, 2013. The judge discussed the holding in *Gant*, quoting, in relevant portion, that "'[c]ircumstances unique to an automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might,' highlighting the word 'might[,]' 'be found in the vehicle.'" He stated,

> that's what I'm going to find here. . . . The fact that [the appellant] was found with a controlled dangerous substance and cash, left the home that was being surveyed [sic] for purposes of getting ready to execute a search warrant related to the [appellant], and I believe it was related to . . . evidence presented that was related to drugs and that's what they were searching for, controlled dangerous substance and related items. To me would suggest that it's entirely possible and in fact there might be evidence found in the vehicle. So that would authorize the police to enter the vehicle and search it under *Arizona* [*v.*] *Gant*.

The judge found that the search of the Solara took place "an hour, hour and ten, twenty minutes" after the arrest and the police officers' justification for searching the Solara was not attenuated simply because the search took place at the police station in that time frame. For these reasons, the court denied the appellant's motion to suppress the evidence found in the Solara.

**Discussion**

The appellant argues on appeal as he did below that the warrantless search of the Solara was not lawful under *Gant*, because he was arrested for assault, not for drug offenses (possession of crack cocaine and related crimes). As the appellant puts it, "[t]he fruits of the post-arrest search cannot provide an alternate justification for the arrest."

7

In reviewing the ruling of the suppression court, we must rely solely upon the record developed at the suppression hearing. *See, e.g., Lee v. State*, 418 Md. 136, 148 (2011). We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion, *id.*, here, the State. We give deference to the first-level factual findings made by the suppression court, and we accept those findings unless shown to be clearly erroneous. *See, e.g., Elliott v. State*, 417 Md. 413, 427 (2010). We, however, make an independent appraisal of the constitutionality of a search, "applying the law to the facts found in each particular case." *Id*. at 428 (quoting *Belote v. State*, 411 Md. 104, 120 (2009)) (internal quotation mark omitted).

*Briscoe v. State*, 422 Md. 384, 396 (2011) (parallel citations omitted).

Searches conducted without a warrant "'are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *Gant*, 556 U.S. at 338 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (footnote omitted in *Gant*). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest. The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* (citations omitted).

In *Gant*, the United States Supreme Court clarified its holding in *New York v. Belton*, 453 U.S. 454 (1981), regarding warrantless vehicle searches incident to the lawful arrest of the vehicle's occupant. In *Belton*, the Court had held "that when an officer lawfully arrests 'the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile' and any containers therein." *Gant*, 556 U.S. at 340-41 (quoting *Belton*, 453 U.S. at 460) (footnote omitted in *Gant*). That holding was based on the Court's "assumption 'that articles inside the relatively narrow compass of the

8

passenger compartment of an automobile are in fact generally, even if not inevitably, within the area into which an arrestee might reach.'" *Id.* at 341 (quoting *Belton*, 453 U.S. at 460) (some internal quotation marks omitted).

The *Gant* Court acknowledged that *Belton* had been "widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search." *Id; see Briscoe*, 422 Md. at 402 (quoting the foregoing language in *Gant*, explaining that "Maryland courts were no different in this regard," and citing several Maryland appellate cases to that effect). It rejected this broad interpretation of *Belton*, explaining:

> The experience of the 28 years since we decided *Belton* has shown that the generalization underpinning the broad reading of that decision is unfounded. We now know that articles inside the passenger compartment [of an automobile] are rarely "within the area into which an arrestee might reach," and blind adherence to *Belton*'s faulty assumption would authorize myriad unconstitutional searches.

*Id.* at 350-51 (internal citation and some internal quotation marks omitted). Accordingly, the Court held: "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or it is reasonable to believe the vehicle contains evidence of the offense of arrest*." *Id.* at 351 (emphasis added). As to the latter, the Court explained:

> In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. But in others, including *Belton* and *Thornton* [*v. United States*, 541 U.S. 615 (2004)], the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein.

9

556 U.S. at 343-44 (internal citations omitted).

In *Gant*, the defendant was stopped for driving on a suspended license, and was handcuffed and secured in a police patrol car. Before moving the car, officers searched it and found a jacket. Inside a pocket of the jacket they found cocaine in a plastic bag. The defendant was charged with possession of a narcotic drug for sale and possessing of drug paraphernalia and was convicted. The Court concluded that the warrantless search of Gant's car was unlawful because Gant "was not within reaching distance of his car at the time of the search," and because there was no "evidentiary basis for the search," as the officers could not have expected to find evidence of Gant's offense – driving on a suspended license – in the passenger compartment of his car. *Gant*, 556 U.S. at 344.

We return to the case at bar. The appellant argues that the warrantless search of the Solara in which he had been a passenger was unlawful under *Gant* because he was not in a position to access the car when it was searched in the parking lot of the police station, and because officers could not have reasonably believed there was evidence in the car related to his second-degree assault charge – the offense for which he had been arrested. According to the appellant, the discovery of cocaine on his person during "the post-arrest search cannot provide an alternate justification for the arrest."

The facts adduced at the suppression hearing show that Officer DeFalco conducted a lawful search of the appellant's person incident to arresting him on the second-degree assault warrant, and while doing so discovered a "clear plastic baggie containing a white rock

10

like substance" in the appellant's front right pocket. Officer DeFalco reasonably believed the substance to be crack cocaine. When Officer DeFalco found crack cocaine on the appellant's person, he had probable cause to believe the appellant was committing a drug offense. And, based on that probable cause, the appellant was charged with various drug offenses that day. It makes no difference that the appellant initially was arrested for second-degree assault pursuant to the warrant. When he was found to be in possession of cocaine, the police had probable cause of a second arrestable offense. Both offenses were encompassed in the act of arrest; a separate act of arrest was not necessary. Thus, the appellant was arrested both on the open warrant and for crack cocaine possession.

The appellant was arrested standing next to the Solara, in which he recently had been riding and that he was trying to enter. Under the circumstances, the arresting officers reasonably could have believed that the Solara contained evidence of the cocaine possession offense the appellant was under arrest for. Under *Gant*, this was sufficient to justify a warrantless search of the Solara. It was not necessary for the State also to show that the appellant was within reaching distance of the passenger's compartment of the Solara when the search was conducted. The court did not err in denying the appellant's motion to suppress the evidence recovered in the search of the Solara.

## II.

## Motion for Mistrial

## Facts and Proceedings

11

As discussed, the appellant was charged with possession of cocaine, possession with intent to distribute cocaine, possession of a firearm under circumstances sufficient to constitute a nexus to drug trafficking, and possession of a regulated firearm after having been convicted of a disqualifying offense. The trial in this case took place over three days, between May 21 and May 23, 2013.

Detective Newton testified that he executed the search warrant at the house at around 6:00 or 7:00 p.m. on January 16, 2013, which was after the appellant's arrest. He was accompanied by another police officer and six or seven members of the SWAT team, who secured the house. In a bedroom closet on the first floor, Detective Newton found $1,400 in cash in the "toe portion of a pair of sneakers." He also discovered photographs of the appellant in that bedroom. In a utility room, Detective Newton located a plastic bag containing five 9mm bullets, and a "long . . . military style rifle."

A forensic chemist with the Anne Arundel County Police Department's Crime Laboratory testified that the substance found on the appellant's person in the parking lot of the Safeway was 6.3 grams of cocaine.

Before trial, the parties stipulated in writing that "[t]he Defendant, Jamar Scribner, has previously been convicted of a disqualifying offense in this state and is prohibited from possessing a regulated firearm under the law." The parties agreed that the jurors would receive the stipulation and that they would not be told that the appellant's disqualifying offense was armed robbery.

On the second day of trial, the prosecutor moved the stipulation into evidence, informing the jurors that it was "the stipulation of prior conviction of disqualifying offense."

The State recalled Detective Holby and the court accepted him as an expert in the area of controlled dangerous substances. Detective Holby testified that street level drug dealers package and distribute cocaine "in small baggies" or "do it loose, just break it off and give it to somebody." He opined that the street value of cocaine is about $100 per gram, so the cocaine seized from the appellant had a value of roughly $630. A street level buyer usually buys "between 20 and 40 dollars worth," or 0.2 and 0.4 grams, respectively. Those buyers often use the lingo of "20 rock" or "40 rock" when seeking to buy these amounts of cocaine from a street dealer. Detective Holby personally had purchased 20 and 40 rocks on the streets of Annapolis, in an undercover capacity.

Detective Holby opined that cocaine can be ingested by smoking, snorting, or injecting. The type of cocaine found on the appellant ordinarily would be smoked by using a "little glass tube or a homemade smoking device [made] out of like a . . . miniature liquor bottle." No such smoking devices were found on the appellant's person or in the Solara. Based on the amount of cocaine found on the appellant, Detective Holby opined that the appellant "did not intend to use" it. He explained that cocaine users buy "just enough to get them by . . . they cannot hold on to 6.3 grams because they would try to smoke it all at once and it probably would not be good for them." Detective Holby also opined that users "generally have the paraphernalia on their person," and the fact that the appellant did have

13

paraphernalia on his person or in the Solara indicated he "wasn't going to smoke that CDS."

Toward the end of Detective Holby's direct examination, the following colloquy took place:

> [PROSECUTOR]:  Now based on all the evidence that – that you've seen and your own involvement in the case, as well as your briefing with the other officers in this case have you – have you made an opinion as to – as to the drugs . . . recovered in this case?
>
> [DET. HOLBY]: Yes.
>
> [PROSECUTOR]:  What is your opinion?
>
> [DET. HOLBY]: My opinion is that the CDS in this case is consistent with street level sales.
>
> [PROSECUTOR]: What are you basing that opinion on? What facts or what evidence?
>
> [DET. HOLBY]: The amount of the CDS, which was located.  What was located at the house, as well.
>
> [PROSECUTOR]: Okay.
>
> [DET. HOLBY]: As well as knowledge of Mr. Scribner.

Defense counsel objected and moved to strike.  The court sustained the objection and stated "[s]trike the last response.  Yes."  A bench conference ensued, at which the following colloquy took place:

> [DEFENSE COUNSEL]: I'm moving for a mistrial, Your Honor.
>
> THE COURT: I'm going to decline.  The reason I'm declining is because there's already been stipulation in this particular case that the Defendant has been convicted of the disqualifying offense and so the jury has

14

some knowledge that your client has a previous record, and I don't think that . . . there's been any damage done so that's why I'm denying the motion.

[DEFENSE COUNSEL]: I just don't think the jury's going to make that leap, Your Honor, that connection that you're making because it's not going to be, you know – [Detective Holby] did know [the appellant's] record when [he] did the search warrant but again, the – the stipulation is a disqualifying crime.

(Indiscernible) for this very reason so then if we didn't (indiscernible), you know, he's saying because I knew about him so now he's – he's leading them to think [the appellant's] got prior distribution on his record.

THE COURT: I disagree with that at this point. It's already in evidence that there's a stipulation of a disqualifying past that (indiscernible) any further (indiscernible) mistrial.

[DEFENSE COUNSEL]: I would just like to note for the record –

THE COURT: It is on the record –

[DEFENSE COUNSEL]: Right, that the prior [disqualifying offense] is not a drug crime . . .

THE COURT: Instruct the jury to disregard but I don't believe that (indiscernible).

Immediately after the bench conference, the court instructed the jury that "the Court has stricken that last response. You're to disregard the last answer of this witness."

At the close of trial, the court instructed the jury, in relevant part, as follows:

The State and the Defense have agreed that the Defendant, Jamar Scribner, has previously been convicted of a disqualifying offense in this state and is prohibited from possessing a regulated firearm under the law as it relates to Question 4 [*i.e.*, the verdict question asking whether the appellant is guilty or not guilty of possessing a regulated firearm after having been convicted of a disqualifying offense].

15

After the jury was instructed but before closing arguments, Defense counsel renewed her mistrial motion with regard to Detective Holby's testimony that he based his opinion in part on his "knowledge of Mr. Scribner." The court again denied the motion.

**Discussion**

The appellant contends the trial court abused its discretion by denying his mistrial motion. He argues that Detective Holby's testimony that his "knowledge of Mr. Scribner" was one basis for his conclusion that "the CDS in this case is consistent with street level sales" communicated to the jurors that Detective "Holby knows appellant to be a drug dealer." He emphasizes that, although the jurors were told by stipulation that he had a previous conviction that disqualified him from possessing a firearm, they were not told the nature of the conviction. The stipulation had the effect of making Detective Holby's testimony "the functional equivalent of evidence that appellant had been previously convicted of the crime for which he was on trial, possession with intent to distribute." According to the appellant, the court's curative instruction could not overcome the prejudice inherent in this communication.

"Generally, appellate courts review the denial of a motion for a mistrial under the abuse of discretion standard, because the 'trial judge is in the best position to evaluate whether or not a defendant's right to an impartial jury has been compromised.'" *Dillard v. State*, 415 Md. 445, 454 (2010) (quoting *Allen v. State*, 89 Md. App. 25, 42-43 (1991)). Here, the court determined in denying the motion that prejudicial information about the

16

appellant's past – the stipulation about a disqualifying conviction – already was in the record and Detective Holby's comment about his "knowledge" of the appellant would not cause further prejudice, if appropriately stricken. We cannot say that the trial court abused its discretion in concluding that any prejudice caused by Detective Holby's remark could be cured by striking it and instructing the jurors to disregard it.

Detective Holby's testimony that one basis for his conclusion that the cocaine recovered was consistent with street level sales was his "knowledge" of the appellant was not tantamount to testimony that the appellant previously was convicted of a CDS crime. Detective Holby did not specify what knowledge he had about the appellant, or when the knowledge was acquired. The evidence disclosed that the police already had obtained a warrant to search for drugs at the house the appellant was associated with and that they had watched the appellant entering and exiting. If the jurors were going to draw any conclusion from what Detective Holby said, it was much more likely that they would conclude that his knowledge of the appellant came from the information that supported the search warrant, not from knowing that the appellant had a CDS-related prior conviction. Moreover, the jurors would have no reason to think that the "disqualifying offense" referenced in the stipulation would have to do with drugs. They were more likely to think that the prior offense had to do with gun possession, given that its only meaning to them was within the context of the possession of a regulated firearm offense.

17

The trial court reasonably concluded that any prejudice that may have arisen from Detective Holby's comment about his "knowledge" of the appellant adequately could be offset by striking the comment and instructing the jurors to disregard it. *See Carter v. State*, 366 Md. 574, 589 (2001) ("If a curative instruction is given, the instruction must be timely, accurate, and effective."). The trial court did not abuse its discretion in denying the appellant's motion for mistrial.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**