56 A.3d 523

**Wesley Torrance KELLY**

v.

**STATE of Maryland.**

Nos. 2479 & 2679, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Nov. 27, 2012.

Juan P. Reyes (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Brian S. Kleinbord (Douglas Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WOODWARD, WATTS and JAMES R. EYLER (Retired, specially assigned), JJ.

JAMES R. EYLER (Retired, specially assigned), J.

This is an appeal by Wesley Torrance Kelly, appellant, from convictions in the Circuit Court for Howard County and the Circuit Court for Anne Arundel County. The cases were consolidated on appeal.

In Anne Arundel County, the court convicted appellant of burglary in the second degree, committed on April 12, 2010,

and sentenced him to ten-years' imprisonment. In Howard County, a jury convicted appellant of theft, committed on April 5, 2010, and the court sentenced him to ten-years' imprisonment.

In both cases, appellant contends the courts erred in denying his motions to suppress evidence allegedly obtained as a result of a Global Positioning System (GPS) device placed on his vehicle on April 2, 2010, by police officers without a warrant. On January 23, 2012, the Supreme Court decided *United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), holding that placement of a GPS device on a vehicle located on a public thoroughfare constitutes a search. *Jones* applies to the cases before us; nevertheless, based on the good faith exception to the exclusionary rule, we shall affirm the judgments.

## Factual and Procedural Background

On December 1, 2010, appellant was convicted in Anne Arundel County. On January 4, 2011, appellant was convicted in Howard County. After appeal and briefing in this Court, the parties requested that the cases be stayed pending the Supreme Court's decision in *Jones.* This Court granted the request. After the Supreme Court's decision was issued on January 23, 2012, the parties filed new briefs.

The issue in both cases is the denial of a motion to suppress evidence. Consequently, the material evidence is that introduced at the hearings on the motions to suppress.

In summary, a series of commercial burglaries occurred in Howard County on February 22, 2010, February 24, 2010, March 2, 2010, March 29, 2010, April 5, 2010, and in Anne Arundel County on April 12, 2010. Howard County police officers began investigating the incidents on February 22, 2010. The first burglary was of a dental office from which, *inter alia,* a signed blank bank check was taken. On February 27, 2010, the check was cashed, with the name of a payee, Nicole Cromwell, and an amount having been added. After reviewing surveillance tape at the bank where the check was

cashed, police officers identified Ms. Cromwell through a computer check. Police officers also learned from the tape that Ms. Cromwell had been dropped off at the bank by a green Chevrolet Trailblazer. On March 5, 2010, officers obtained an arrest warrant for Ms. Cromwell. On March 9, officers arrested Ms. Cromwell. She cooperated and identified a person named "Tony" as the person who gave her the check. She also provided a residence address for Tony, an apartment at 3706 W. Saratoga Street. Police officers conducted surveillance of that residence, noted the presence of the Trailblazer, conducted a computer check of the Trailblazer, and determined it was owned by appellant. Police officers obtained a photograph of appellant and showed it to Ms. Cromwell, who identified appellant as Tony, the person who gave her the check.

Subsequently, on April 2, 2010, police officers placed a GPS tracking device on the exterior of appellant's Trailblazer. The device was on the vehicle from April 2 through April 12. The device tracked and recorded movement of the vehicle, producing six hundred pages of data. Police officers did not monitor the device at all times but used it to locate appellant on at least three occasions. Based on the information obtained prior to placement of the device and additional information obtained after placement of the device, police officers, on April 12, 2010, obtained search warrants for appellant's Trailblazer, two residences, and three pawn shops. A search of those locations produced incriminating evidence.

A more detailed recitation follows.

### Anne Arundel County Suppression Hearing

On October 15, 2010, the Anne Arundel County circuit court held a hearing. Sergeant Duane Pierce, a detective with the Howard County Police Department, testified that, sometime prior to April 2, 2010, he became involved in the surveillance of appellant because appellant was a suspect in commercial burglaries. Sergeant Pierce determined that appellant lived at 1118 Harwall Road in Gwynn Oak. On April 2, 2010, Sergeant Pierce attached, with a magnet, a GPS device to the

exterior of appellant's vehicle. At that time, the vehicle was located on a public street, parked near appellant's residence. Sergeant Pierce stated the device was basically "an ordinary cell phone" with GPS and cellular components. In addition to monitoring the signal from the GPS device, officers conducted visual surveillance of appellant's vehicle at various times, the first being on April 5. On April 12, Sergeant Pierce was monitoring the GPS device, and he was alerted that appellant's vehicle was moving. Sergeant Pierce directed units to the location of the vehicle as revealed by the device, which was the Chesapeake Square Shopping Center, on Ritchie Highway, south of the Interstate 695 Beltway.

Corporal David Abuelhawa, a detective with the Howard County Police Department, testified that he was involved in visual surveillance of appellant's vehicle on April 5, 6, and 12. On April 12, after being alerted by Sergeant Pierce, Corporal Abuelhawa responded to the location of appellant's vehicle at Chesapeake Square Shopping Center. After observing appellant's vehicle parked in front of a clothing store, Corporal Abuelhawa called for back up. Corporal Abuelhawa observed appellant kick the glass out of the front door to the store, enter the store, and exit with a bag full of clothing. Appellant placed the bag in his vehicle. When a police officer approached appellant, appellant fled the scene.

Detective Matthew Mergenthaler, a detective with the Howard County Police Department, testified that on April 12, he obtained a search warrant for appellant's vehicle. The documents relating to the warrant were admitted into evidence.

Detective Mergenthaler included the following information in the affidavit in support of the request for a warrant. Detective Mergenthaler was assigned to investigate a series of commercial burglaries of medical offices and computer stores that had occurred from February 22, 2010 through April 5, 2010 in Howard County.

The burglary on February 22 was of a dental office. Among other things, a signed blank bank check was reported missing. Detective Mergenthaler determined that the stolen check had

been made payable to Nicole Cromwell and cashed. A review of the bank's surveillance footage from the time of the transaction revealed a white female matching the description of Nicole Cromwell, as determined from a computer check with the Maryland Motor Vehicle Administration. The surveillance footage also revealed that the female had been dropped off by someone driving a green Trailblazer.

On March 5, 2010, Detective Mergenthaler obtained an arrest warrant for Nicole Cromwell and, on March 9, arrested her. Ms. Cromwell stated that she had obtained the check from someone named "Tony" who drove the Trailblazer depicted in the surveillance tape and who resided at 3706 W. Saratoga Street. Detectives conducted surveillance of the residence and determined that the Trailblazer described by Ms. Cromwell was registered to appellant. They obtained a photo of appellant and showed it to Ms. Cromwell who identified him as Tony.

With respect to the April 5 burglary, when police officers arrived at the scene of the burglary, they noticed a Trailblazer in the area that matched, by appearance, appellant's vehicle. The scene of the burglary was a computer warehouse from which computer equipment had been taken. Shortly after the burglary, detectives located appellant, observed a printer manual on the front seat of his vehicle, and observed appellant place what appeared to be a computer monitor in a box. Detectives followed appellant while he visited three different trading stores or pawn shops, and in each instance, he entered with boxes and returned to his vehicle with boxes. They followed appellant to a residence at 3706 W. Saratoga Street, which he entered carrying boxes.

On April 12, while conducting visual surveillance of appellant in his Trailblazer, they followed him to a location on Ritchie Highway, the Chesapeake Square Shopping Center. The detectives observed appellant smash a window in a place of business, enter the business, and return with clothing. When approached, appellant fled in his vehicle. The detec-

tives pursued him. Appellant "bailed out" at some point, and the detectives recovered appellant's vehicle.

Defense counsel argued that all of the evidence had been obtained as a result of the illegal placement of the GPS device and should be suppressed. The court denied the motion.

### Anne Arundel County Trial

Appellant and the State entered into a plea agreement. Appellant pled not guilty on an agreed statement of facts to burglary in the second degree in exchange for a *nolle pros* in another case and a sentence not to exceed ten years to run concurrently with any other sentence.

The agreed facts were as follows.

That on April 12, 2010 beginning at approximately 4 a.m. detectives from the Howard County Police Department ROU [Repeat Offender] Unit as well as Property Crimes Section began surveillance of the Defendant with the aid of a GPS system attached to the Defendant's car. They also began visual surveillance of the Defendant.

They followed the Defendant into Anne Arundel County and the Defendant proceeded to the Casual Male store which was at 6710 Governor Ritchie Highway Number G in Glen Burnie, Anne Arundel County, Maryland. That store is the property of Casual Male Retail Group, LLC.

At that time the detective set up surveillance and watched the Defendant from covert locations and at that point Detective Abuelhawa of the Howard County Police got out of his car and then proceeded to the Defendant's location on foot. The Defendant's car was parked in front of the Casual Male store with the hatch up. He was driving a Chevrolet Trail Blazer blue—sorry—green in color.

The Defendant was seen by Detective Abuelhawa [to] go into the back of his truck and retrieve a plastic bag. He then took that plastic bag over to the front of the store where Detective Abuelhawa observed that the glass window of the side of [the] front door had been smashed. The Defendant further smashed the glass using the plastic bag

to cover his hand and then proceeded inside of the store without permission of owners or the manager, Andrew Zabka.

The Defendant went into the Casual Male, he then proceeded to load the plastic bag with several items of clothing, then left the store, went to this truck, and then put the bag of clothing inside of his truck.

At that point the Defendant had also dropped some of the items that he had taken from the store. Detective Abuelhawa identified himself as a police officer. The Defendant made eye contact with the detective [who] recognized the Defendant as Wesley Torrence Kelly who is seated at defense table next to counsel in blue. He recognized him from prior surveillance.

He watched as the Defendant jumped into his vehicle and fled. The defendant led the police officers on a high speed chase. At some point Anne Arundel County got involved in the chase, and in fact at some point they lost sight of the Defendant.

They knew that at some point the Defendant made a stop, I believe it was at Powder Mill Lane—Wesley Lane and Powder Mill Road. The Defendant proceeded into Baltimore City where he bailed out of the car and left the car. Detective Laffin of the Howard County Police actually recovered the car, secured it, and police towed it back to Howard County where they did in fact search the car and found a shirt belonging to the Casual Male with the tag still attached.

They also found along the trail, the route the Defendant took, clothes belonging to the Casual Male store. Mr. Zabka would have testified the Defendant did not have permission to go into the store, nor was he an employee, he did not have permission to remove any of the clothing items that belonged to Casual Male.

### Howard County Suppression Hearing

On November 19, 2010, Howard County held a hearing on appellant's motion to suppress. The court admitted into evi-

dence the six search warrants obtained by Detective Mergenthaler on April 13, including the applications for warrants. In addition to appellant's vehicle, the warrants were directed at the apartment at 3706 W. Saratoga Street, the Gold Trading Center, Shine Corner, the Edmondson Village Center Pawn Shop[1] and the residence at 1118 Harwall Road. The applications for warrants directed at residences and businesses contained essentially the same information as that contained in the application for a search warrant for appellant's vehicle.

Defense counsel argued that all evidence was obtained as a result of the illegal placement of the GPS unit and should be suppressed. After Sergeant Pierce and Detective Mergenthaler testified, the parties supplemented the evidence with a proffer of relevant facts.

We reproduce appellant's summary of the testimony and proffer, as set forth in his brief, deleting transcript references.

The State proffered that a GPS tracker was placed on Mr. Kelly's vehicle on a public street outside his residence at 1118 Harwall Road in Woodlawn in Baltimore County. The GPS unit was installed on April 2, 2010 at the request of property detectives who had been investigating a burglary that had occurred earlier in the year in Howard County and suspected Mr. Kelly's involvement. The tracker was programmed such that Howard County police would be notified if and when Mr. Kelly's vehicle, a green 2004 Chevrolet Trailblazer, came within a perimeter of Howard County. On April 5, 2010, shortly after 4:00 a.m., the GPS tracker notified Sergeant Pierce that Mr. Kelly's vehicle was approaching Howard County. He obtained a location and sent Detective Laffin to Riverwood Drive and Old Columbia Road in Howard County. As Detective Laffin drove towards the area, he observed a vehicle matching the descrip-

---

1. The three businesses are the trading center/pawn shops referenced in Detective Mergenthaler's affidavit in support of the search warrant for appellant's vehicle, which was admitted into evidence in the Anne Arundel County proceeding as well as the Howard County proceeding, and is summarized above.

tion of Mr. Kelly's, but was not able to see who was driving the vehicle. Laffin continued to 7125 Riverwood Road after Sergeant Pierce informed him that the vehicle in question had stopped at that location. Laffin found a door at the Advanced Programs, Inc. ("API") building at 7125 Riverwood Drive to be unsecured and observed pry marks and damage to the strike plate. Meanwhile, the alarm company monitoring the business alerted police to an alarm at that location. Detective Mergenthaler met with an API employee who informed him that there were items in brown cardboard boxes that had been stolen from the warehouse. Specifically, two Hewlett Packard printer models, two API computer monitors and four API boxes containing computer hard drives, keyboards, and computer mice had been taken. Mergenthaler obtained serial numbers for the missing equipment.

After determining that a burglary had occurred at API, officers again utilized the GPS tracker to locate Mr. Kelly's vehicle at 8:30 a.m. at the Carroll Manor Elementary School in Adamstown. Detectives Luckey and Laffin responded to the area and observed the vehicle parked in the parking lot of the school which was under construction. At 10:30 a.m., the officers went onto the construction site to look inside of the vehicle. Detective Luckey saw several large boxes in the back of the vehicle and a Hewlett Packard printer manual located in the front passenger seat. They left the site and continued their surveillance and Detective Luckey observed a man matching Mr. Kelly's description enter the vehicle, open the rear door, and place a computer monitor in one of the boxes. He remained in the car for 20 minutes then returned to the construction site.

Mr. Kelly left in the vehicle at approximately 2:30 p.m. and he was followed by the detectives. They followed him to his residence at 1118 Harwall Road in Gwynn Oak, Maryland. He entered the house, then left shortly thereafter. He drove to another residence at 3706 West Saratoga Street, entered and exited with two computer boxes that he placed in his truck. Mr. Kelly was then followed to the

Gold Center Pawn Shop at 2022 Dennison Street in Baltimore. He removed a large box from the rear of the vehicle and entered the pawn shop. He returned and retrieved another object and reentered the shop. He then exited the pawn shop at 4:21 p.m. carrying a small box and returned to his vehicle. He then drove to the Shine Corner, Inc. pawn shop at 26 Hilton Street in Baltimore. He entered the pawn shop with three large computer boxes, then exited about ten minutes later and drove back to the residence at 3706 West Saratoga Street.

At 5:06 p.m. Mr. Kelly was observed carrying two large Hewlett Packard boxes and two other smaller boxes up to the residence. At 5:10 p.m., Mr. Kelly was observed entering the vehicle and driving to the Edmondson Village Pawn Shop in Baltimore. He entered carrying paperwork, and exited about five minutes later. He returned to the Harwall Road residence and went inside.

On April 6, 2010, surveillance was resumed when Detective Pierce received a notification from the GPS unit indicating that the vehicle was moving. Officers found the vehicle at the Westview Promenade Center in Frederick, parked to the rear of the shopping center behind several closed businesses. Detective Laffin observed a black male, matching Mr. Kelly's description walking from the direction of the Verizon Wireless and White House Black Market stores before the suspect saw Laffin and returned to his vehicle and left the area. He proceeded to a commercial business park on Pegasus Court in Frederick and was observed driving and stopping in front of several closed businesses. He exited the vehicle briefly then walked back and drove to the construction site at Carroll Manor Elementary School. Officers found evidence of two attempted break-ins at the business park.

On April 12, 2010, at approximately 4:00 a.m., Detective Pierce received an alert from the GPS tracking unit that the vehicle was in motion and thereafter notified surveillance units to follow the vehicle. Sergeant Pierce notified officers that the vehicle was on Interstate 695 headed towards Glen

Burnie.  At 4:35 a.m., Sergeant Pierce notified the respond-ing officers that the vehicle was parked in the parking lot of the Chesapeake Square Shopping Center.  Officers arrived to find the vehicle backed into a parking spot in front of the Casual Male clothing store at 6710 Ritchie Highway in Glen Burnie.  One of the detectives noticed that the front door of the business had been smashed out and observed the sus-pect enter the store with an empty plastic bag and exit the store with a full bag of clothing.  Officers then approached the vehicle and the suspect quickly entered the vehicle and exited the parking lot at a high rate of speed.

The suspect led officers on a high speed chase and eventually eluded them.  Sergeant Pierce utilized the GPS tracker to locate the vehicle parked in the alley between Wesley Avenue and Bellview avenue.  The driver had fled the scene prior to the officers's arrival and the vehicle was towed to the Howard County Police Department Northern District.

At 6:15 a.m., officers set up surveillance at both the 1118 Harwall Road residence in Gwynn Oak and the 3706 West Saratoga Street residence in Baltimore.  Search and seizure warrants were prepared for both locations and for the vehicle as well as the pawn shops visited by Mr. Kelly.  Mr. Kelly was taken into custody at 2:00 p.m. after leaving 3706 West Saratoga Street.

\*       \*       \*

Sergeant Duane Pierce of the Howard County Police Department testified that he installed a GPS tracking device on Appellant's Chevrolet Trailblazer on April 2, 2010.  Ac-cording to Sergeant Pierce, the GPS device used, like most modern cellular phones, had a cell phone component and a GPS component and both were used to determine the location of the target vehicle at any given time.  The device transmitted information, "just like a cell phone would."  The self-powered device was installed on the exterior of the vehicle using magnets.  Sergeant Pierce crawled under-neath the vehicle and attached the device to the frame of the car.  At the time of the installation, the car was parked

at 1118 Harwall Road in Gwynn Oak, Maryland, across the street from Appellant's residence. It was stationed in a public parking spot on the street. The GPS device was programmed to continuously track and record the location of the vehicle and immediately began to do so upon installation. Officers had the option of reviewing the location data at a later time and could also initiate "real time" tracking, which allowed them to track the vehicle as it moved. Sergeant Pierce programmed the device to alert him whenever Appellant's vehicle approached the Howard County line. According to Sergeant Pierce, there were three methods of retrieving data from the GPS device: 1) connecting it to a computer after detachment from the vehicle, 2) obtaining the recorded information wirelessly while the device was still attached to the vehicle, and 3) "live tracking." Sergeant Pierce could not recall whether "live tracking" was used between April 6th and April 12th, nor did he know whether the archived information in the GPS device was later used in the investigation.

On April 5th, 2010, at approximately 4:00 a.m., Sergeant Pierce received a notification from the tracker that the vehicle had entered Howard County and at that point he notified other officers to respond to the Columbia area of Riverwood Drive and Old Columbia Road. Detective Laffin responded to the area, and observed the vehicle driving through parking lots slowly making short stops. Laffin then proceeded to check the buildings in the area. Later that day it became known that a burglary had occurred at 7125 Riverwood Drive, in the area in question.

Detective Matthew Mergenthaler responded to 7125 Riverwood Drive on April 5, 2010 and met with a business representative of Advanced Programs, Inc. He learned that items had been taken from the business early that morning and obtained search and seizure warrants in an attempt to locate the missing items. The warrants were executed on April 13th, 2010 at different pawn shops and some items were recovered.

At approximately 8:30 a.m. on April 5, 2010, the GPS device was again utilized to locate the vehicle at Carroll Manor Elementary School in Adamstown. Detectives Laffin and Luckey were directed to respond to that area. Once the detectives responded, they found the vehicle and conducted surveillance throughout the day. Sergeant Pierce used the "live tracking" option on the GPS periodically throughout the day as needed in conjunction with the surveillance by the other detectives.

Sergeant Pierce testified that based on previous patterns, he was requested to do more mobile surveillance and change the parameters utilized in locating the vehicle. At around 4:00 a.m. on April 12, 2010, Detective Pierce received an alert through his phone that the Appellant's vehicle was moving and he initiated "live tracking." He then directed police surveillance members to the location of the vehicle which was parked at the 6700 block of Ritchie Highway in Glen Burnie. The officers responded and found the vehicle. A chase ensued later that day and Sergeant Pierce assisted with the pursuit by tracking the vehicle and advising officers of its location. The vehicle was eventually found unoccupied in Baltimore City and was towed back to the Northern District where the GPS tracker was removed on April 12.

Relying on this Court's decision in *Stone v. State,* 178 Md.App. 428, 941 A.2d 1238 (2008), discussed later in this opinion, the court denied the motion to suppress all evidence.

### *Howard County Trial*

At trial, the police officers testified to their investigation and observations but did not mention GPS tracking.

### Arguments

Relying heavily on *Jones, supra,* appellant argues that placement of the GPS device was a search because it constituted a physical trespass to chattel and violated his reasonable expectation of privacy. Acknowledging that the Supreme Court, in *Jones,* did not reach the question of reasonableness,

appellant argues that a warrantless search is per se unreasonable, unless it fits within a recognized exception, none of which are applicable in these cases. Appellant adds that the State has waived any reasonableness argument because it was the State's burden to establish reasonableness, and it failed to do so in circuit court.

Appellant also argues that the good faith exception to application of the exclusionary rule, as enunciated in *Davis v. United States,* —— U.S. ——, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), does not apply because there was no "binding appellate precedent" in Maryland, at the time of placement of the tracking device, holding that such action was legal. Appellant explains that this Court's decision in *Stone, supra,* relied on by the circuit court, is distinguishable and, in light of *Jones,* based on faulty reasoning. Thus, it was not binding appellate precedent within the meaning of *Davis.*

The State, impliedly conceding that placement of the GPS device was a search, argues that appellant failed to argue that the search was unreasonable, and thus, he waived that argument. The State also argues that the facts in these cases are very different from those in *Jones,* and the search in these cases was reasonable. Relying on *Davis* and *Stone,* the State argues that, in any event, the officers acted in good faith based on established precedent. Next, the State argues that all of the evidence was seized pursuant to search warrants, and thus, the independent source doctrine applies. Pursuant to that doctrine, the State argues the "tainted" information in the applications for warrants should be excised, and the untainted information assessed to determine if it constituted probable cause. The State concludes that the untainted information was sufficient to constitute probable cause. Finally, the State argues that appellant's commission of a new crime on April 12, in the presence of police officers, purged the taint from any unlawful search.

With respect to the independent source and intervening crime arguments, appellant responds that they were not raised in circuit court and, thus, cannot be raised on appeal.

In any event, according to appellant, all of the evidence was obtained as a result of placement of the GPS device and was tainted.

## Discussion

### Pre–United States v. Jones

In the context of police use of electronic tracking devices, we begin with *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In that case, the defendant was convicted of transmitting wagering information by telephone, in violation of a federal statute. The government introduced evidence of a telephone conversation by defendant which had been obtained by virtue of a listening device attached to the outside of a public telephone booth. The majority, recognizing the absence of a physical trespass, and recognizing that the government had probable cause to obtain a warrant, *id.* at 354, 88 S.Ct. 507, concluded that placing the device without a warrant was an unreasonable search and seizure. *Id.* at 353, 88 S.Ct. 507. The basis for the conclusion was that the government's action violated what has come to be known as a reasonable expectation of privacy.

In *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), police officers had information that the defendant was purchasing chloroform to use in an illicit drug operation. With the consent of the seller, the officers placed a beeper in a drum of chloroform which was then sold to the defendant. After the drum was placed in the defendant's vehicle, the officers followed the vehicle through a combination of tracking the beeper signal and visual surveillance. They tracked the defendant to a cabin in a secluded area. After three days of visual surveillance, the officers obtained a search warrant for the cabin and found a drug laboratory. *Id.* at 277, 103 S.Ct. 1081.

A majority of the Court held that the application for warrant, based in part on information obtained via the beeper, was not constitutionally infirm. Applying the *Katz* analysis, the Court explained that a person traveling on a public

highway in a vehicle has no reasonable expectation of privacy in the person's movements from one location to another. *Id.* at 281, 103 S.Ct. 1081. The Court further explained that the Constitution did not prevent the officers from augmenting their natural senses with technology, *id.* at 282, 103 S.Ct. 1081, and that the beeper simply was a more effective method of observing what was already public. *Id.* at 284, 103 S.Ct. 1081.

Before turning our attention to Maryland cases, we expound on *Davis, supra.* In that case, police officers conducted a traffic stop of a vehicle in which the defendant was a passenger. The officers arrested the defendant for providing a false name and placed him in their vehicle. The officers then conducted a search incident to arrest of the vehicle, including the defendant's jacket, where they found a firearm. After the defendant's motion to suppress the firearm was denied, the defendant was convicted of unlawful possession of a firearm.

The search occurred in Alabama, located in the Eleventh Circuit. It was conducted in accordance with binding precedent in that circuit, *i.e., United States v. Gonzalez,* 71 F.3d 819, 822 (11th Cir.1996), which, applying *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), had held that a search of a passenger compartment in a motor vehicle incident to arrest of an occupant is lawful, even if the occupant is no longer in the vehicle at the time of the search. While the defendant's appeal was pending, the Supreme Court decided *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), which limited the scope of a search of an unoccupied vehicle. The *Davis* Court applied the *Gant* decision retroactively, 131 S.Ct. at 2430, thus rendering the *Davis* search unlawful. Nevertheless, the Supreme Court held that the exclusionary rule did not apply because the search was conducted in good faith reliance on binding precedent. 131 S.Ct. at 2429.

In *Briscoe v. State,* 422 Md. 384, 30 A.3d 870 (2011), the Court of Appeals had before it a challenge to a search incident to arrest of a locked glove compartment in a vehicle. While the case was pending on appeal, the Supreme Court decided

*Gant.* The State conceded the search violated *Gant* but argued, *inter alia,* that the good faith exception to the exclusionary rule applied. *Id.* at 389, 30 A.3d 870. The Court of Appeals applied the *Davis* good faith exception because the search was lawful at the time under *Belton,* as applied in Maryland. *E.g., Gee v. State,* 291 Md. 663, 435 A.2d 1387 (1981). 422 Md. at 391, 30 A.3d 870. In explaining, the Court stated:

The principle that emerges from *Davis* is that operation of the exclusionary rule is suspended only when the evidence seized was the result of a search that, when conducted, was a "police practice" specifically authorized by the jurisdiction's precedent in which the officer operates. To decide whether the particular search at issue in the present case—the search of the locked glove compartment—comes within the *Davis* rule, we must examine what Maryland law dictated at the time of that search.

The search of Petitioner's vehicle was conducted on June 26, 2007. At that time, the search of the minivan incident to Petitioner's arrest was governed by the then-prevailing *Belton* bright-line rule. See *Gee,* 291 Md. at 668, 435 A.2d at 1389–90; *McCain,* 194 Md.App. at 276, 4 A.3d at 66. Under *Belton,* a glove compartment is included in the *Belton* perimeter. See *Belton,* 453 U.S. at 461 n. 4 [101 S.Ct. 2860]. At the time of the search at issue, no reported decision of this Court or the Court of Special Appeals had addressed specifically whether a police officer conducting a *Belton* search could open a locked glove compartment.

Petitioner takes the position that, because, at the time of the search at issue, no reported decision in Maryland expressly authorized police to open a locked glove compartment as part of a *Belton* search, there did not exist at that time "binding appellate" Maryland authority upon which Officer Bormanshinov could have "reasonably relied" in searching the glove compartment. The State acknowledges that there was no then-existing reported Maryland decision specifically authorizing the search of a locked glove compartment. The State points out, though, that, "just prior to

the suppression hearing in this case, the Court of Special Appeals [in *Hamel v. State*, 179 Md.App. 1, 18, 943 A.2d at 696 (2008)] made it clear that *Belton* permitted the search of a locked gloved compartment." Petitioner replies that *Hamel* is of no benefit to the State, because it was filed two months after the search in question and thus could not serve as precedent upon which Officer Bormanshinov could objectively and in good faith rely. We are in general accord with the State that the *Davis* good-faith exception applies to the search at issue, although we take a slightly different tack in reaching that conclusion.

We understand the *Davis* Court's reference to binding appellate precedent to mean that the caselaw of the jurisdiction must have been clear about whether that jurisdiction had adopted the bright-line rule of *Belton*. Petitioner and the State do not disagree that, until *Gant* was decided, *Belton* was a part of Maryland law. And, under *Belton*, the police are entitled to search the entire passenger compartment of a vehicle, including the glove compartment. To repeat, the *Belton* Court made clear that, in a search for both weapons and destructible evidence incident to a valid arrest of a vehicle's occupant, police may search "inside the relatively narrow compass of the passenger compartment" of the vehicle, and may "examine the contents of any containers found within the passenger compartment[.]" 453 U.S. at 460 [101 S.Ct. 2860]. The *Belton* Court defined "container" for this purpose as "denot[ing] any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like." *Id.* at 460–61 n. 4 [101 S.Ct. 2860]. We believe it to be clear, under *Belton* itself, that a locked glove compartment is within the scope of the rule announced in that case, notwithstanding that the Court made no effort to include that detail or, for that matter, any other fact-specific details concerning the scope of the search. Indeed, the *Belton* Court expressly eschewed a fact-specific rule in favor of a brightline rule

that could be easily applied by officers in the field. See *id.* at 458 [101 S.Ct. 2860] ("[A] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." (internal quotation marks omitted)).

Petitioner is correct that, before the Court of Special Appeals's decision in *Hamel,* no reported Maryland appellate decision expressly held that the police, in conducting a *Belton* search, may open a locked glove compartment. Given the bright-line nature of the *Belton* rule, however, it would be unfaithful to its very design and purpose to have its application and, in turn the application of the *Davis* good-faith exception, depend on whether a container, undeniably within the so-called *Belton* perimeter, is locked or unlocked. In other words, the Court of Special Appeals, in deciding *Hamel* as it did, merely applied the *Belton* rule to the specific facts of the case. *Hamel* did not create new "binding appellate precedent" in Maryland; rather, that case merely applied what was at the time, and had been since 1981, Maryland law.

We therefore hold that, before *Gant,* binding appellate precedent in Maryland, namely *Belton,* dictated that searches incident to arrest of recent occupants of vehicles included searches of all containers, whether locked or unlocked, within the passenger areas of the vehicles. Officer Bormanshinov acted in objectively reasonable reliance on that authority when he searched the locked glove compartment. It follows then, that the good-faith rule of *Davis* applies, and the suppression court correctly denied the motion to suppress the handgun found there.

(Footnotes omitted.) *Id* at 406–410, 30 A.3d 870.

In *Stone v. State,* 178 Md.App. 428, 941 A.2d 1238 (2008), the defendant was convicted of burglary and theft. The defendant was arrested after the vehicle in which he was riding as a passenger was stopped by police officers. The officers effected the stop because they had probable cause to believe, based on their prior investigation, that appellant was

involved in a burglary. The officers obtained the information on October 14, 2005. On the same day, after obtaining the information, the officers obtained the defendant's cell phone number, and through enlisting his cell phone carrier to "ping" his phone, located the defendant's vehicle. At that time, the officers placed a GPS device on his vehicle. On October 17, 2005, using the signal from the GPS device to locate the defendant's vehicle, the officers effected the stop and arrest of the defendant. Between October 14 and October 17, the officers did not obtain information implicating the defendant in the crimes in question in addition to that which they already had. *Id.* at 437–38, 941 A.2d 1238.

On appeal, appellant argued, *inter alia,* that the trial court abused its discretion in limiting the defendant's cross-examination of a police officer with respect to locating the defendant's vehicle through the use of the "ping" and, later, through the GPS device. We stated:

> The suppression court did not abuse its discretion in cutting short the appellant's cross-examination about the cell phone "ping" and the GPS tracking device because it was unlikely that cross-examination on those points would have produced any relevant evidence. *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), is controlling.

> In *Knotts,* government agents investigating allegations that the defendant and two codefendants were manufacturing amphetamines arranged with the seller of chloroform, used in the manufacturing process, to place a radio transmitter, i.e., a "beeper," inside a chloroform container sold to a co-defendant. At first, the agents used visual observation and the beeper monitoring to follow the co-defendant's vehicle after he purchased the chloroform. Eventually, when they suspected their cover was no longer intact, they relied upon the beeper alone to show the route of that vehicle, which ended at the defendant's secluded cabin in West Virginia. After conducting surveillance for three days, the agents obtained a search warrant for the cabin. The search revealed "a fully operable, clandestine drug

laboratory." *Id.* at 279 [103 S.Ct. 1081]. The defendants were charged with federal drug crimes.

The defendant moved to suppress the evidence found in his cabin on the ground that the agents had violated his Fourth Amendment rights by using the "beeper" placed in the chloroform container to follow the co-defendant's vehicle to the cabin. His argument was rejected at the trial level but accepted on appeal. The Supreme Court reversed. It noted first that application of the Fourth Amendment depends upon whether the person invoking it can claim a legitimate expectation of privacy. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It observed that

> "[t]he governmental surveillance conducted by the means of the beeper in this case amounted to principally following an automobile on public streets and highways," and that "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *Knotts, supra,* 460 U.S. at 281 [103 S.Ct. 1081] (quoting *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality)).

The Court reasoned that when the co-defendant "traveled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." *Id.* at 281–82 [103 S.Ct. 1081]. It observed that, although the defendant had a reasonable expectation of privacy inside his cabin, that expectation did not "extend[ ] to the visual observation of [the co-defendant's] automobile arriving on his premises after leaving a public highway, nor to movements of objects such as the drum of chloroform outside the cabin in the 'open fields.'" *Id.* at 282 [103 S.Ct. 1081]

(quoting *Hester v. United States,* 265 U.S. 57, 58, 44 S.Ct. 445, 68 L.Ed. 898 (1924)). Ultimately, the Court concluded that

[v]isual surveillance from public places along [the co-defendant's] route or adjoining [the defendant's cabin] would have sufficed to reveal all of these facts to the police. The fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of [the co-defendant's] automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case.

460 U.S. at 282 (emphasis added). See also *Gibson v. State,* 138 Md.App. 399, 414–17, 771 A.2d 536 (2001) (holding that a person has no reasonable expectation of privacy in his location within a public space).

The GPS tracking device in the case at bar is simply the next generation of tracking science and technology from the radio transmitter "beeper" in *Knotts,* to which the *Knotts* Fourth Amendment analysis directly applies. The appellant and his wife did not have a reasonable expectation of privacy in their location as they traveled on public thorough-fares. With the transmission from the GPS device, Trooper Bachtell was able to locate Joanne Stone's pickup truck as she was driving it on a public road, where she had no reasonable expectation of privacy, and where she could be seen by the trooper or anyone else. Under *Knotts,* the use of the GPS device could not be a Fourth Amendment violation, and hence further inquiry about it, on cross-examination of Trooper Bachtell, would not have led to relevant information.

Use of the cell phone "ping" information also was not relevant. The "ping" information revealed that the appellant's cell phone was located, at that very time, somewhere "within a two mile radius of the Frederick County Detention Center." Using that information, Trooper Bachtell drove

on the public roads in the vicinity of the detention center and saw, outside on a motel parking lot, in full public view, a vehicle registered in the appellant's name. Thus, the cell phone "ping" information, like the GPS tracking information and the beeper information in *Knotts*, served to narrow the area of public space in which to look for the appellant, his vehicle, or both.

In *In the Matter of the Application of the United States for an Order Authorizing the Installation and Use of Pen Register and a Caller Identification System on Telephone Numbers*, 402 F.Supp.2d 597, 604–05 (D.Md.2005), the court held that, to use real time cell phone "ping" technology to obtain evidence of a crime, the Fourth Amendment requires the government to obtain a warrant by showing probable cause to believe a crime has been or is being committed. In the case at bar, however, the cell phone "ping" technology was not being used to obtain evidence with which to generate probable cause. As we have explained, the investigating officers already had probable cause to believe that the appellant had committed burglary and felony theft. They were using the cell phone "ping" technology merely to find the appellant so they could take him into custody, already having probable cause to support an arrest, and not to gain information that would furnish probable cause to arrest. Moreover, they were not using the technology to locate the appellant in a private space. They used it only to narrow the area of public space in which to search for the appellant to place him under arrest. In other words, the cell phone "ping" technology was being used as a tracking device, like the GPS, to locate the appellant in public.

For the reasons we just have discussed, the appellant did not have a reasonable expectation of privacy in his location in the public, and, more specifically, in a vehicle riding on public roads, and therefore evidence about the use of the GPS device and the cell phone "ping" information merely to locate him in public, which just as well could have been done by human visualization—though less efficiently—was not

relevant to the appellant's Fourth Amendment-based suppression motion.

*Stone,* 178 Md.App. at 446–50, 941 A.2d 1238.

### United States v. Jones

The defendant, Jones, was suspected by law enforcement of trafficking in narcotics. Police officers obtained information through various investigative techniques and then applied for a warrant authorizing the placement of a GPS device on a vehicle that was regularly used by the defendant. A warrant was issued, authorizing placement of the device in the District of Columbia within ten days. The device was not placed in ten days and was placed in Maryland, in violation of the warrant requirement. Consequently, the issue presented was whether a warrant was required. *Jones,* 132 S.Ct. at 948.

The device was placed on Jones's vehicle while the vehicle was parked in a public parking lot. Police officers used the device to track the vehicle over a period of 28 days. The information was transmitted to a computer, generating over 2,000 pages of data. *Id.*

After the defendant was indicted, he filed a motion to suppress evidence obtained through use of the GPS device. The motion was granted in part, and the defendant was ultimately convicted. On appeal, the United States Court of Appeals for the District of Columbia Circuit reversed and, employing a *Katz* analysis, held that the admission of the evidence obtained by the warrantless use of the GPS device violated the Fourth Amendment. *Id.* at 949 (citing *United States v. Maynard,* 615 F.3d 544 (D.C.Cir.2010)).

The Supreme Court, in *Jones,* affirmed the Court of Appeals. The sole issue decided by the Court was whether the attachment of a GPS device "to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the *Fourth Amendment." Id.* at 948. Justice Scalia, writing for a majority of the Court, relying on pre-*Katz* tort law, based their decision on the fact that government

officials had committed a common law physical trespass. 132 S.Ct. at 950. Justice Scalia explained that the *Katz* reasonable expectation of privacy analysis was intended to be in addition to, not a substitute for, the common law trespassory test. *Id.* at 951. Thus, there was no need to determine whether the officials' actions violated the *Katz* test as well.

Justice Scalia added:

> The Government argues in the alternative that even if the attachment and use of the device was a search, it was reasonable—and thus lawful—under the *Fourth Amendment* because "Officers had reasonable suspicion, and indeed probable cause, to believe that [Jones] was a leader in a large-scale cocaine distribution conspiracy." ... We have no occasion to consider this argument. The Government did not raise it below, and the D.C. Circuit therefore did not address it.

*Id.* at 954.

Justice Sotomayor, concurring, agreed that physical trespass was appropriate and sufficient to support the Court's conclusion but, given the extent of electronic surveillance, also discussed the reasonable expectation of privacy test, positing many hypothetical questions and opining that at some point the questions would have to be answered under that test. *Id.* Justice Alito, writing for the remaining justices, and concurring in the judgment, stated that those justices would decide the case under the expectation of privacy test and would conclude that the "lengthy monitoring" was a search. *Id.* at 958.

*Was there an unreasonable search in the case at bar?*

■ With respect to whether a search occurred, in *Jones,* five justices concluded that the government's actions constituted a search, based on physical trespass. In the case before us, there was a physical trespass, and therefore, placement of the GPS device constituted a search, without need to address appellant's reasonable expectation of privacy and whether the

facts in this case, distinguishable from the facts in *Jones*, would pass muster.

The Supreme Court did not reach the question of reasonableness. We will not predict how the Supreme Court will decide that question and what standard it will employ when the question is before it in the context of GPS devices. In the cases before us, we note that, at the time a police officer placed the GPS device, officers knew there had been a series of commercial burglaries, and they had information that appellant was involved in one of them. Thus, at the time an officer placed the device, officers had probable cause to arrest appellant for the February 22 burglary, but did not arrest him, and they had reasonable suspicion that appellant was involved in other burglaries. We need not decide the question of reasonableness because we conclude that, in any event, the search comes within the *Davis* good faith exception.[2]

### Good faith exception

As we noted above, in *Davis*, the Supreme Court held that the exclusionary rule does not apply if a search was conducted in good faith reliance on binding precedent. The question then becomes what is meant by binding precedent. We shall review the federal cases cited by the parties because we find that helpful to our application of *Davis*, *Briscoe*, and *Stone*.[3]

After the decision in *Knotts*, prior to the decision in *Jones*, and prior to the search in the cases before us, United States Courts of Appeals for the Seventh, Ninth, and Eighth Circuits filed opinions, addressing the placement of GPS devices on a

---

2. The parties agree that *Jones* applies to the facts of this case, even though the search occurred well prior to the *Jones* decision. *See Briscoe v. State, supra,* and *State v. Holt,* 206 Md.App. 539, 51 A.3d 1 (2012).

3. The applicability of the good faith exception to the exclusionary rule was not decided by the circuit courts. It is an issue of law, and we exercise our discretion to decide the issue because it arises due to a change in the law after the circuit courts' decisions. *See McCain v. State,* 194 Md.App. 252, 278 (2010).

vehicle. In all three instances, a GPS device was placed by law enforcement authorities on the defendant's vehicle when it was located in a public place. Relying heavily on *Knotts*, the courts concluded there was no search because the defendants had no reasonable expectation of privacy with respect to the acts in question. *United States v. Garcia*, 474 F.3d 994, 996 (7th Cir.2007) (length of monitoring is unclear); *United States v. Pineda–Moreno*, 591 F.3d 1212, 1216 (9th Cir., January 11, 2010) (officers installed several GPS devices on defendant's vehicle and monitored movement over a four month period), vacated *sub nom. Pineda–Moreno v. United States*, —— U.S. ——, 132 S.Ct. 1533, 182 L.Ed.2d 151 (2012); and *United States v. Marquez*, 605 F.3d 604, 609 (8th Cir.2010) (officers monitored movement over a multi-month period). In *Marquez*, 605 F.3d at 610, and in *Garcia*, 474 F.3d at 996, the Courts noted that the law enforcement authorities had reasonable suspicion that the defendants were engaged in criminal activity at the time they placed the devices, perhaps implying that was the applicable standard.

Appellant calls our attention to *People v.Weaver*, 12 N.Y.3d 433, 882 N.Y.S.2d 357, 909 N.E.2d 1195 (2009), *Commonwealth v. Connolly*, 454 Mass. 808, 913 N.E.2d 356 (2009), and *State v. Jackson*, 150 Wash.2d 251, 76 P.3d 217 (2003), all decided post *Knotts*, pre *Jones*, and prior to the date of the search in the case before us. In *Weaver*, a GPS device was placed on the defendant's vehicle and monitored for 65 days. 882 N.Y.S.2d 357, 909 N.E.2d at 1202. In *Connolly*, a GPS device was placed in the defendant's vehicle by officers who entered the vehicle and over a one hour period connected the device to the vehicle's electrical system. 913 N.E.2d at 369. In *Jackson*, a GPS device was placed on the defendant's vehicle after obtaining a warrant. Thus, the search was legal, but the court stated that a warrant was necessary. 76 P.3d at 221. In all three cases, the basis of the courts' decisions was the state's constitution, not the Fourth Amendment.

Appellant also calls our attention to the decision in *United States v. Maynard, supra*, the decision by the District of Columbia Court of Appeals that was reversed in *Jones*. The

*Maynard* decision was not filed until August 6, 2010, however, after the search in the case before us.

The parties also cite cases, decided post *Jones* and post *Davis,* applying the good faith exception to the exclusionary rule. The State calls our attention to the following.

In *United States v. Baez,* 878 F.Supp.2d 288, 2012 WL 2914318 (D.Mass.2012), the court, located in the First Circuit, applied the good faith exception to a placement of a GPS device on a vehicle for 347 days. *Id.* at 292–93, 2012 WL 2914318 at *4. The court stated there was no split in the federal circuits prior to *Maynard* and even though that case was filed prior to the search in *Baez,* it was filed only three days before and, thus, insignificant to the analysis. *Id.* at 295–96, 2012 WL 2914318 at *7. The court concluded that "binding" within the meaning of the *Davis* good faith exception should not be applied literally and a substantial consensus among precedential courts is sufficient. *Id.* at 296–98, 2012 WL 2914318 at *8–9.

In *United States v. Leon,* 856 F.Supp.2d 1188 (D.Haw.2012), in 2009, a GPS device was placed on a vehicle for five months. *Id.* at 1190. The court, located in the Ninth Circuit, found there was binding Ninth Circuit precedent authorizing the placement of the device prior to the placement in *Leon, i.e., United States v. McIver,* 186 F.3d 1119 (9th Cir.1999) (held placement of GPS device on a vehicle located in a public place did not violate reasonable expectation of privacy, decided prior to *United States v. Pineda–Moreno, supra* ). The court concluded that there was an objective good faith belief that the extent of the monitoring in *Leon* was authorized. *Id.* at 1192.

In *United States v. Rosas–Illescas,* 872 F.Supp.2d 1320, 2012 WL 1946580 (N.D.Ala.2012), a GPS device was placed on a vehicle in December, 2011. *Id.* at 1321–24, 2012 WL 1946580 at *1–3. The court applied the good faith exception to the exclusionary rule, based on precedent, specifically, *United States v. Michael,* 645 F.2d 252 (the former Fifth Circuit 1981) (*en banc* ) (device was a beeper). *Id.* at 1325–27, 2012 WL 1946580 at *5–6.

In *United States v. Shelburne*, 2012 WL 2344457, 2012 U.S. Dist. LEXIS 85368 (W.D.Ky.2012), a GPS device was placed on a vehicle in November, 2011. The *Shelburne* court was located in Kentucky, in the Sixth Circuit, but the device was placed by law enforcement officers in Indiana, which is located in the Seventh Circuit. *Id.* at \*4, 2012 U.S. Dist. LEXIS 85368 at \*11–12. The *Shelburne* court stated that there was precedent in the Seventh Circuit authorizing the placement of the device, *i.e., United States v. Garcia, supra,* and that was sufficient to apply the good faith exception. *Id.* at \*5–6, 2012 U.S. Dist. LEXIS 85368 at \*14.

Appellant references the following. In *United States v. Lee*, 862 F.Supp.2d 560 (E.D.Ky.2012),[4] a GPS device was placed on the defendant's vehicle in September, 2011. *Id.* at 562. The court, located in the Sixth Circuit, interpreted the *Davis* requirement of "binding precedent" literally, and, observing that the Sixth Circuit had not spoken on the subject of GPS devices, concluded that the good faith exception did not apply. *Id.* at 570.

In *United States v. Ortiz*, 878 F.Supp.2d 515, 2012 WL 2951391 (E.D.Pa.2012), authorities placed a GPS device on the defendant's vehicle, when located in a public area, in November, 2010, and again in January, 2011. *Id.* at 520–25, 2012 WL 2951391 at \*3–8. The court, located in the Third Circuit, refused to apply the good faith exception because there was no binding Third Circuit precedent. The court stated that, in order for the *Davis* good faith exception to apply, there must be binding precedent, explaining that non binding persuasive precedent, even if it represents the majority or super majority view, does not suffice. In addition, the binding precedent must be on the "particular" police practice in question. *Id.* at 538–40, 2012 WL 2951391 at \*21–22.

In *United States v. Katzin*, 2012 WL 1646894, 2012 U.S. Dist. LEXIS 65677 (E.D.Pa.2012), authorities placed a GPS

---

**4.** Appellant cites to 2012 WL 1880636, 2012 U.S. Dist. LEXIS 71205 but that was the recommended opinion by a United States Magistrate Judge.

device on the defendant's vehicle for two or three days. *Id.* at *5, 2012 U.S. Dist. LEXIS 65677 at *17. The court, located in the Third Circuit, noted there was no binding decision in that circuit and also noted that *United States v. Maynard,* decided after the search in the case before us, *id.* at *7, 2012 U.S. Dist. LEXIS 65677 at *23, created a "split" in the federal circuits. *Id.* at *7, 2012 U.S. Dist. LEXIS 65677 at *24. Based on that split and the fact that less that half of the federal circuits had opined on the issue, the court concluded that the good faith exception did not apply. *Id.* at *10, 2012 U.S. Dist. LEXIS 65677 at *32.

Similar to what some United States District Courts have done, we read the Court of Appeals's decision in *Briscoe* as interpreting *Davis* to mean that binding precedent does not require that there be a prior appellate case directly on point, *i.e.,* factually the same as the police conduct in question. Indeed, the situation before us is similar to the situation before the Court in *Briscoe.* Just as Maryland had generally recognized *Belton* as permitting a search incident to arrest of an unoccupied vehicle, Maryland had recognized and applied the rationale of *Knotts, i.e.,* that the owners of vehicles did not have a reasonable expectation of privacy in their movement on a public highway. *Stone,* 178 Md.App. at 446–48, 941 A.2d 1238. In addition, as was true of many courts, including apparently the four dissenting members of the Supreme Court, this Court, in *Stone,* assumed that the expectation of privacy test was the prevailing legal standard.

We conclude the good faith exception to the exclusionary rule applies, and the court did not err in denying the motion to suppress evidence. In light of our conclusion, there is no need to address the remaining arguments.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**